The opinion of the court was delivered by
Watkins, J.
Plaintiff demands of the defendants in solido one hundred thousand dollars as damages for a libel upon him personally, and as Mayor of the city of New Orleans, charging the libel to consist of an editorial article which appeared in the issue of the Daily States of July 23, 1894, a newspaper owned and operated by the defendant company, and which was chiefly edited at the time by its co-defendant, H. J. Hearsey.
He alleges that said newspaper article was scurrilous, malicious, defamatory and libelous, and that in writing and publishing said article said defendants were actuated by malice and a desire to injure his reputation and character, as well as to deprive him of the esteem of the public, and to exclude him from intercourse with men of *1118 honesty, and to render him odious and detestable. That not only was that article inspired by hatred and malice, but it was absolutely false, and wholly without foundation in point of fact.
The answer of the defendants is a general denial, coupled with a special defence, the substance of which is as follows, to-wit:
That the article entitled “A Den of Thieves,” which is alleged to have been libelous, was intended to and called the attention of the public to the corruption which it was the general belief then existed in the administration of the city government, and with a view to its investigation; that as a public journalist it was its duty, a,s well as its right, to comment upon all matters of public interest, and, as far as possible, direct attention to such facts, as it could ascertain, and that it did so in perfect good faith, and, in so doing, stated only what it believed to be true after careful investigation and inquiry; that respondents deny that they were actuated by malice, but they, on the contrary, aver that the sole motive and purpose of the publication was “to secure the advancement of the public interests, without the slightest care for individuals.”
That respondents asserted in the aforesaid article that the statements were made chiefly upon the representations which a certain designated contractor with the city had made to a contemporary newspaper of the city, and that same were published in the regular course of business, as being of great public interest, and without malice, or personal feeling.
That it is the duty of an American newspaper to keep the public advised of all matters of general interest, and to aid in securing good and faithful government; and that they had the right to publish and comment upon all the events and facts surrounding the administration of the city government in good faith and without malice, and are nob therefor answerable in damages to any person or official.
Summarized, defendants’ answer is an averment that the publication charged to have been libelous was directed against corruption, Which was at the time generally supposed to exist in the administration of the city government, and that the disclosures were made with a view to their investigation, as it was the duty of a public journalist to have done. That, in so doing, they acted in good faith and stated only what they believed to be true after careful inquiry and investigation; and that same was done without malice, and solely for the purpose of securing the advancement of the public *1119 interest “without the slightest care for individuals.” Thatinmaking said statement defendants relied upon the statements which a city contractor had contemporaneously made to another daily newspaper of the city, and which they accepted and believed.
In addition, the defendants rest their defence upon the liberty and freedom of the press.
The case was tried and decided by the judge without the intervention of a jury; and from a judgment in favor of the plaintiff for the sum of five hundred dollars, the defendants have appealed; and the plaintiff answered the appeal and prayed for the allowance to be increased to the full amount claimed.
The determination of this cause depends exclusively upon a proper-construction to be placed upon the alleged libelous article, as interpreted by the managing editor of the Daily States, who was the only witness introduced on the part of plaintiff — indeed the only witness, of consequence, who testified in the cause.
In the course of his interrogation, many exceptions were taken and bills of exception reserved pro et con; but the tenor of the judge’s rulings thereon was, that the witnesses’ statements were admissible for the purpose of mitigating damages and not to prove justification, as no plea of justification had been made in defendant’s-answer. We are of the opinion that the ruling was sound and conservative, and in strict conformity to the pleadings.
For it appears from the transcript that during the progress of the trial an effort was made on behalf of the defendants to prove the truth of the charges laid in the alleged libelous article; but objection having been raised to its admissibility, on the ground that no justification was pleaded in thé answer, same was sustained and the testimony rejected; but while thus ruling the judge offered the defendants an opportunity to amend their answer instanter and make the plea — without objection being made by the plaintiff — but the offer was declined.
The article complained of as libelous we have extracted from the paper filed in evidence, and reproduce same in its entirety, as follows, viz.:
“ THE DEN OF THIEVES.
“ Three members of the City Council have been indicted by the grand jury, and charges of equally as disgraceful a nature have been made against others and also against the Mayor. Under the pecu *1120 liar laws of Louisiana the Criminal District Judge has felt bound to quash these indictments, and there is a general feeling of disgust throughout the community at the possibility, if not the probability, of these rascals escaping punishment for their crimes.
“ It is true that an indictment'is not a verdict of guilty; but the evidence on which these indictments were found is common property, and on that, together with corroborative circumstantial testimony, these men have been found guilty by the people and in the eyes of the people they are guilty, just as though they had been pronounced so by a jury and sentenced to the penitentiary by the judge. They may escape the penalty of the law, but they can not escape the condemnation and contempt of their fellow-citizens. The brand, not of Cain, but of the blackmailer and the sneak thief, is on their brows, so indelibly fixed that it will burn there in lurid letters until the coffin and the grave shall close over them forever, and their names and their acts of infamy have passed out of the memories of men. Go where they may the cry will follow them, ‘ Behold the bribe-takers.’
“ It is distressing to think that, while the judge regards the law under which these rascals were indicted as repealed, the District Attorney and his assistant believe that the act which the judge holds repealed the law under which the indictments were found is utterly insufficient to meet the case, and hence, with a Council of blackmailers and bribe-takers on our hands, there is no law in Louisiana under which they or any one can be brought to justice.
“And while this is the situation as to the Councilmen already indicted, anew and wider view of corruption has been opened before us. We have already printed the statement of Mr. Orlopp, the contractor for building the new court house and jail, showing how he was fleeced by the gang and the friends of the gang.
“ It has been shown by that statement that Mayor Fitzpatrick, after he came into office, pretended to discover that the bond which the previous administration had found was entirely satisfactory was defective, and forced the contractor to make a new and local bond, composed of the Mayor’s friends, and to pay these bondsmen five thousand dollars for their names.
“It has also been shown that the firm of Manion & Co., of which the Mayor, or his wife, which is the same thing, is the chief partner, endeavored to force from the contractor twenty-five thou *1121 sand dollars for a job which another contractor had offered to do for-ten thousand five hundred dollars, and that, finally, in fear of the power of the Mayor, and with a full knowledge that the Mayor would exercise his power, the contractor did give the Mayor’s firm fifteen thousand dollars, or about five thousand dollars more than the lowest bid for the job, and thus gave up five thousand dollars of' his legitimate profits under the Mayor’s command to ‘ stand and deliver.’
“ It has also been shown that Oity Engineer Brown took from the' contractor the work of paving and gave it to his chum, and, nO' doubt, partner in jobbery, Fritz Jahneke, at a higher price, thus-swindling the treasury in the interest of a favored individual. >
“It has also been shown that at the dictation and under the-threats of Brown the contractor was forced to give the glass work' and interior woodwork to Mr. Henry Wellman’s company, in which Brown is a stockholder, at a larger price than other parties had bid for it, and that inferior glass was put in and inferior woodwork done; that Brown accepted this inferior material and work and the contractor was thus swindled out of a part of his profits and the public swindled in the quality of the work.
“ All these facts have been shown and no serious denial has been made by the parties inculpated in this rascality and these swindling-operations.
“ So far all these grave charges rested chiefly upon the statement-of Mr. Orlopp, the contractor, who had been held up and robbed by the Mayor, the city engineer, Fritz Jahneke and the firm of Henry Wellman, Brown & Co. But another witness has appeared on the scene. Mr. Ligón was the partner and co-contractor of Mr. Orlopp. Mr. Ligón knew all the facts in these transactions and was really better informed than Mr-. Orlopp, since it was through him that the blackmailers chiefly did their bulldozing. Mr. Ligón suddenly disappeared from the city when it was noised about that he was wanted by the grand jury, and much speculation was indulged in as to his-whereabouts and his motive for leaving the city. He was finally located at his old home in Pittsburg, Texas, and our enterprising-contemporary, the Times-Democrat, sent a reporter to find him and interview him. The T.-D.’s representative was successful, and that journal prints a dispatch giving a part of Mr. Ligon’s statement, which the States reproduces in another column. It turns out that a *1122 member of the City Council (Mr. Ligón declines to give the name,except to the grand jury) gave him one thousand dollars and the assurance that seven thousand dollars due him and Orlopp on their contract, and which the boodlers were and are holding back, would be promptly paid him if he would escape the deputy sheriffs and leave the city. The one thousand dollars were paid Mr. Ligón, but the promise to pay the seven thousand dollars due on the contract has not been fulfilled; hence, Ligón feels no moral compunction about returning to New Orleans and testifying before the grand jury. He is right. The one thousand dollars is only a small part of the money the Mayor, the City Engineer and their friends and firms have robbed him of, and as the whole of the promise had not been carried out, Mr. Ligón should come forward and expose this whole scandalous business.
“Mr. Ligon’s statement, so far as it goes, corroborates all that Mr. Orlopp has said, and goes even further. He said to the T.-D.’s reporter:
“‘Had Mr. Orlopp or myself refused to do as Brown directed in giving out contracts to his friends and the concern in which he was a director, he would have ruined us both by refusing to approve our work, no matter how perfect it might have been; also by refusing to approve our bill, which would have forced us into endless litigation and financial loss.’
“ He further states that he and Orlopp were compelled to bribe a number of councilmen for peace and to escape wholesale robbery and ruin. and|he corroborates his partner’s statement that had the original plans and specifications been adhered to, the city would have had a much better building than they have now after the revisions and jobs of the Mayor, the City Engineer, Fritz Jahncke and Wellman.
“Is it possible, under our peculiar laws, for the District Attorney and his assistants to find a law that will hold and punish these jobbers and bribe-takers? We trust there may be. The scandals that have grown out of this contract and the other corrupt acts of the City Council have attracted the attention of the whole country, and if the corruptionists can not be punished under our criminal statutes, or are not displaced by impeachment under our civil statutes, New Orleans will wear the stigma of being ruled by blackmailers and bribe-takers without laws to punish them and without a population with *1123 the manhood to remove them from office.* The Council is little else than a den of thieves. If we can not send them to the penitentiary, let us impeach them and turn them out.”
The caption of the article is The Den of Thieves; and its opening sentence is that “ three members of the City Council have been indicted by the grand jury and charges of equally as disgraceful a nature have been made against others, and also against the Mayor.” Then follows the statement that these indictments had been quashed, coupled with the statement that “they may escape the penalty of the law, but can not escape the condemnation and contempt of their fellow-citizens. The brand, not of Gain, but of the blackmailer and the sneak thief, is on their brows, so indelibly fixed that it will burn there in lurid letters, until the coffin and the grave shall close over them together, and their names and their acts of infamy have passed out of the memories of men. Go where they may, the cry will follow them, ‘ Behold the bribe-takers!’ ”
In the same connection we find this statement, viz.:
“We have already printed the statement of Mr. Orlopp, the contractor for building the new court house and jail, showing how he was fleeced by the gang and the friends of the gang. It has been shown by that statement that Mayor Fitzpatrick, after he came into office, pretended to discover that the bond which the previous administration had approved as entirely satisfactory was defective, and forced the contractor to make a new and local bond, composed of the Mayor’s friends, and to pay their bondsmen- five thousand dollars for their names.”
• This is succeeded by the statement that the firm of which the Mayor was a member “endeavored to force from the contractor fifteen thousand dollars for a job which another contractor had offered to do for ten thousand five hundred dollars;” and that ‘finally, in fear of the power of the Mayor, and with full knowledge that the Mayor would exercise his power, the contractor did give the Mayor’s firm fifteen thousand dollars, or about five thousand dollars more than the lowest bid for the job; and thus gave up five thousand dollars of his legitimate profits, under the Mayor’s command to stand and deliver.’” (Our italics.)
After having enumerated the various charges, this general allegation is made, viz,:
“ So far, all of these grave charges rested chiefly upon the state *1124 menb of Mr. Orlopp, the contractor, who had been held up and robbed by the Mayor," etc. (Our italics.)
Subsequently, the article makes this specific declaration, viz.:
“ The one thousand dollars is only a small part of the money the Mayor, the City Engineer and their friends and firms have robbed him of,” etc.
That these are most grave and serious charges against the plaintiff, in his capacity of Mayor of the city of New Orleans, there can be no doubt; and, smarting under them, he filed this suit on the day-after they appeared in the Daily States.
The managing editor of the paper, in the course of his testimony as a witness, makes the following explanation of his editorial article. The Den of Thieves, to-wit:
That, as managing editor of that paper, he wrote the article in question. That he was personalty acquainted with the plaintiff, who-was, at the time, Mayor of the city. Says the average daily circulation of that paper is at this time between 9500 and 10,000, though it was not so great at that time, and that four-fifths of its circulation is within this city.
He states that at that time the condition of the public mind in reference to the status of the city administration was very intense, “ and that the general feeling in the community was that the whole thing was rotten, and that jobs were being perpetrated, and that bribery and corruption prevailed on every hand at the City Hall * * * And the publication of Mr. Orlopp’s interview in the Times-Demoerat, in which these specific charges are made, were generally accepted as true.”
That it was upon that article that his editorial was chiefly predicated. Says he “ would not have made the charges if (he) had not-had that specific statement of Mr. Orlopp to proceed upon.” Says that he “ absolutely believed it to be true. When a man makes such a statement as that in so serious a manner (he thinks) he makes it upon his honor, the same as if he was before the court making a sworn statement.”
That he “ believed it was true then, and (he) felt it to be (his) duty to act as (he) did.”
He says that in writing and publishing the newspaper article that is complained of he was not actuated by malice toward the plaintiff; that believing “in the truth of the statement published *1125 by Mr. Orlopp (he) was absolutely satisfied that Mr. Fitzpatrick was guilty. And (he) therefore felt it to be (his) duty to make this attack in the interest of the public.” That he regarded “ a newspaper as the notary of the people; and when there is any act of corruption among any public officers (he) considers it the duty of the newspaper to take notice of it. But if a newspaper never was to .attack a rascal, until the truth of the charge was proven in a court of justice, no scoundrel on earth in office would ever be exposed;” and he “ thought (he) would be recreant to (his) duty as a public journalist if (he) did not expose what (he) thought to be rascality.”
He says he had no grievance against the plaintiff. That he never ■did him any harm. “ He never antagonized any interest that (he) had.” That he did it “ from a purely unselfish and patriotic standpoint.” That he thought the facts were proved, and it ought to be impressed upon the authorities; and that they ought to be brought to trial.”
He admits that he never had a personal interview with Mr. Orlopp •on the subjects mentioned in the editorial article which is complained of-; but that he thought the published statements in the Times-Demcorat were true. That he made no investigation as' to the truth or falsity of the charges made in said editorial, but acted in its .preparation and publication upon publications made in other newspapers, and the statements of other people.
The following is by plaintiff’s counsel, viz.:
“ Q,. Then when you wrote this statement, you had nothing to base your plea upon, except what you had read (in) other newspapers?
“A. Only the statement of Mr. Orlopp, and the general course of legislation of the City Council, which rendered it perfectly obvious to every intelligent and investigating mind that the things charged were true.
“ Q. Then the only investigations which you made was the reading of publications in other newspapers.
“ A. Yes; and the action of the Council and the general drift of their legislation.
¡¡t :{s #
“ Q,. Did you read Mayor Fitzpatrick’s denial of this charge?
“ A. I believe I did, but I did not place any particular faith in it.
*1126 “ Q. Then you believed the other statement without any investigation except from other newspapers?
“A. And from public opinion.
“ Q. Where did you get that public opinion?
“ A. From people in the city.
“ Q. I understand you to say that you do’not know Mr. Orlopp?
“ A. I don’t know him personally.
“ Q,. Before the publication of this article of July 23, 1894, did you ever see any newspaper article charging the Mayor with being a a robber, a holder-up, or a blackmailer?
"A. I don’t remember seeing that particular thing. I saw the facts published on which I based this article in other papers.”
Inasmuch as the testimony turns upon the statements which Mr: Orlopp made to the Times-Democrat, we have extracted same from the issue of that paper of date July 15, 1894, and reproduce them as follows, viz.:
“ When I obtained the contract for the building of the new court house and jail I was called upon by the old Council, then headed by the Hon. Joseph A. Shakspeare, to give a bond of one hundred thousand dollars for the faithful performance of my contract. I furnished a bond which was signed by a Galveston banker and a Galveston merchant.
“ This bond was a solvent one and perfectly satisfactory to that-body. In giving out the contracts the contract for lime, sand, cement and brick was given to J. J. Clarke. The New Orleans Manufacturing and Lumber Company got the glass work and interior-woodwork. The flooring furnished by this company was not in accordance with the specifications, and I objected to them, as did also-the daily superintendent appointed by Mr. Brown, the City Engineer. Notwithstanding this Mr. Brown accepted the work. Messrs. Manion & Co. obtained the steam-heating, the plumbing, gas fitting and the electrical work of the building, and I don’t think this work is up to the specification. Mr. Fritz Jahncke wanted the Schillinger work at one dollar and eighty cents a yard, but as I could have it done for one dollar and forty cents and one dollar and forty-five cents I would not let him have it. Mr. F. Codman Ford furnished the tiles and terra cotta flooring; Thos. Owens the slating, and P. *1127 F. Bailey the plastering. The Crescent City Cornice Works did the sheet iron and metal work, and the Whitney Iron Works did most of the iron work.
“ When the present Council came into existence Mayor Fitzpatrick insisted upon my furnishing a new bond for one hundred thousand dollars with local sureties. I protested, as the bond I had given was a solvent one and had been accepted by the Shakspeare Oouncil. In fact, I consulted some of the old Council and they told me to stand on my rights. But then I saw that I would be plunged into litigation and a world of trouble, and to avoid this I agreed to furnish the bond. City Engineer Brown named three of the bondsmen. He selected Fritz Jahncke, Henry Wellman and J. J. Clarke. I don’t know who selected the other two bondsmen. They were Henry P. Dart and T. W. Maroney. They signed the bond for me of one hundred thousand dollars, and in consideration thereof I was forced to pay them five thousand dollars. In lieu thereof I gave Mr. Henry Wellman five notes of one thousand dollars each, and in addition to this they forced me to give them an indemnity bond of one hundred thousand dollars, which was signed by the Pauley Jail Building Company of St. Louis, Mo.”
The only thing which is discoverable upon the face of this statement is, that when he (Orlopp) obtained the contract to build the new court house and jail from the Shakspeare administration, he furnished a bond with sureties residing in the city of Galveston, Tex., for one hundred thousand dollars; and when the Fitzpatrick administration came into power, Mayor Fitzpatrick insisted upon his furnishing a new bond “with local sureties.” He says he finally consented to this, under protest, and that the persons who signed his bond charged him five thousand dollars tor the service; but, notwithstanding their names are given, that of the plaintiff is not amongst them, and no charge of any sort in connection therewith is preferred against the plaintiff.
With regard to the bid of Manion & Co., with whom the plaintiff is alleged to have had some occult relations, we clip the following statement of Orlopp, from the Times-Democrat of July 18, 1894, viz.:
“ One of the most peculiar transactions connected with the building was the steam heating and plumbing, for which Messrs. Manion & Co. got the contract from me ” said Mr. Orlopp. “When I *1128 •was about to let this contract Messrs. Manion & Co. put in a bid for twenty-five thousand dollars. I could not listen to this proposition, as I had in my possession a bid from a Dallas firm for ten thousand five hundred dollars, and a bid from Mr. J. M. Ferguson for twelve thousand five hundred dollars. Manion then put iu another bid for fifteen thousand dollars, and promised me that if he was awarded the contract that he would have P. J. Maroney refund me the one thousand dollars that he had charged me for signing my bond for the faithful performance of my duty. For peace and policy sake, and this one thousand dollars consideration, I gave Manion & Co. the contract, and Manion & Co. gave over the one thousand dollars. Whether 'this work is according to contract and specification an Investigation can very easily establish.”
This statement is, that Manion & Co. obtained the contract from Orlopp for steam-heating and plumbing the new court house and jail. "That they put in a bid at twenty-five thousand dollars, but it was •declined because he had two prior bids at a lower figure. That Manion & Co. then put in a bid at fifteen thousand dollars, promising to rebate to him the sum of one thousand dollars, if same was awarded to them; and that he (Orlopp) accepted their proposition “for the sake of peace and harmony” — the other bids being ten thousand five hundred dollars and twelve thousand five hundred dollars, respectively.
We find quite a similar statement in regard to the one hundred thousand dollar bond in the Daily Picayune of July 16, 1894.
The foregoing is a fair summary of all the evidence ill the record. •Surely there is nothing in the extracts we have made from either the Times-Democrat or Picayune to justify the defendant’s editorial assumption that Mr. Orlopp had, in the matter of the bond, been “fleeced by the gang, and the friends of thegang;” or “ that Mayor Fitzpatrick, after he came into office, pretended to discover that the bond was defective and forced the contractor to make a new and local bond, composed of the Mayor’s friends,” etc.
There is surely no foundation therein for the editorial assumption that Manion & Co. “endeavored to force from the contractor twenty-five thousand dollars for a job which another had offered to do for ten thousand five hundred dollars; and that finally, in fear •of the power of the Mayor * * he did give the Mayor’s firm fifteen thousand dollars,” etc.
*1129 Nor do they show that this contractor had, in any sense, been held up and robbed by the Mayor.”
These fierce and unguarded utterances, in an editorial article appearing in a leading and influential public journal of a great and populous city, and directed against its chief magistrate, were destined to attract general attention and comment; and undoubtedly did the plaintiff great injury, personally, as well as officially, in his feelings, reputation and character. And, if untrue, they were libelous, and slanderous, in the extreme.
While admitting the authorship of, and the fullest responsibility for the editorial, the defendants do not aver, in their answer, the truthfulness of the statement and plead justification; but it is alleged to have been directed against corruption in the administration in the city government, and that the disclosures made were necessary in order to stimulate an investigation thereof, and the advancement of the public interest ‘-without the slightest care for individuals.”
That in making said statement, the editor solely relied upon the statement which a city contractor had made to another daily paper, and in the truthfulness of which he placed full confidence without making an investigation on his own account.
But it is shown by the testimony that even if the position of the defendants were perfectly tenable, that they had a right to rely upon the statements found in the local columns of another daily newspaper, and thereupon base an editorial article upon them as facts actually established, they did not conform themselves or the newspaper either to the reproduction of the statements therein made, or to proper and legitimate comments thereon. But, quite to the contrary, the defendants greatly enlarged the statement contained in the articles relied upon, employing the language of personal •denunciation and abuse under a mistaken notion of rendering a service to the city, regardless of the rights of the individuals assailed, and amongst them the plaintiff.
The caption of the article. “ The Den of Thieves,” was an appropriate heading for an editorial of -that character, though it is far from the view we entertain of “ the liberty of the press” to intimate that it can be excused or palliated on that ground.
While we feel free to admit that the preservation of good and pure ^government, either in city or State, greatly depends upon a free and *1130 fearless expression of public sentiment through the columns of the journals of the country, yet we are equally free to affirm that same must and can be accomplished by cogent, temperate and well-reasoned articles, predicated upon facts, and not in hasty, intemperate and opprobious epithets and personal criticism and abuse.
There is a marked and clear distinction to be taken between the liberty and the license of the press.
Judge Cooley states that “it is conceded on all sides that the' common law rules that subjected the libeller to responsibility for the private injury, or the public scandal or disorder occasioned by his conduct, are not abolished by the protection extended to the press in our Constitution.” Cooley’s Con. Lim., p. 420.
And that author approvingly quotes the rule announced by -Chief Justice Parker in Commonwealth vs. Blanding, 3 Pickering, 313, that “ the liberty of the press was to be unrestrained, bub he who used it was to be reasonable in case of its abuse; like the right to keep firearms, which does not protect him who uses them for annoyance or destruction.”
That author formulates the following rule upon the subject, which has met the unqualified approval of jurists and publicists, v.z.:
“The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the' citizens may please, and to be protected against any responsibility for so doing, except so far .as such publications, from their blasphemy, obscenity or scandalous character, may be a public offence, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals. Or, to state the same thing in somewhat different words, we understand liberty of speech and of the press to imply nob only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords.” Id. 421.
And in treating of the right of action by the party injured by any publication, that author very justly observes:
“There are (at common law) many cases, also, where the law presumed injury, and did not call upon the complaining party to make any other showing that he was defamed than such implication as arose from the character of the communication itself. If it accused him of a criminal offence, involving moral turpitude, and siich as- *1131 would subject a party proved guilty of it to punishment by imprisonment; * * * if the charge affected the party in his business, office or means of livelihood, like charging a trader with insolvency or the like; or if any injurious charge holding a party up to public contempt, scorn or ridicule were propagated by printing, writing, signs, burlesques, etc., the law presumed injury, and the charge was said to be actionable per se.” Id. 425.
But to that general rule that author states the following exception, viz.:
“There are certain cases where criticism upon public officers, their actions, character and motives, is not only recognized as legitimate, but large latitude and great freedom of expression are permitted, so long as good faith inspires the communication.” Id. 431.
And, having commented on the authorities; he remarks that “recent English cases give considerable latitude of comment to publishers of public journals, upon subjects in the discussion of which the public may reasonably be supposed to have an interest; and they hold the discussions to be privileged if conducted within the bounds of moderation and reason.” Id. 440.
Kelley vs. Sherlock, 1 Law Reporter, 2 B., p. 686.
In confirmation of this opinion, the ease of Wason vs. Walter, L. R. 4, Queen’s Bench, 73, is cited, in which the proprietor of the London Times was prosecuted for criticism of certain debates in the House of Lords, and it was therein held that this was a subject of great public concern, on which a writer in a public newspaper had a full right to comment; and that the occasion was so far privileged that the comments would not be actionable “ so long as a jury should find them honest and made in a fair spirit, and such as were justified by the circumstances disclosed in the debate.”
Having given due attention to the authorities pro and con, that author makes the following summary of the law of privilege, in respect to newspapers, viz.:
“The question, however, is not new, and the authorities have generally held the publisher of a paper to the same rigid responsibility with any other person who makes injurious communications. Malice on his part is conclusively inferred if the communications are false. It is no defence that they have been copied with or without comment from another paper; or that the source of information was stated at the time of the publication; or that the publication was *1132 made in the paper without the knowledge of the-proprietor, as an advertisement or otherwise; or that it consists in a criticism on the course and character of a candidate for public office; or that it was a correct and impartial account of a public meeting, or of any proceedings in which the public have an interest,” etc. Id. 455.
Of the foregoing principles we find the following cases to be correct exponents, viz.: Hotchkiss vs. Oliphant, 2 Hill, 510; King vs. Root, 4 Wendell, 138; Sanford vs. Bennett, 24 N. Y. 20; Dole vs. Lyon, 10 Johns. 447; Mapes vs. Weeks, 4 Wendell, 659; Inman vs. Foster, 8 Wendell, 602; Andus vs. Wells, 7 Johns. 260; Huff vs. Bennett, 4 Sandf. 120; Martin vs. Van Schaick, 4 Paige, 479; Commonwealth vs. Nicholls, 10 Metcalf, 259.
. In King vs. Root, supra, the court announced the general rule to be “ to permit editors to publish what they please in relation to the character and qualifications of candidates for office, but holding them responsible for the truth of what they publish.”
Mr. Black, in treating of the “ freedom of speech and of the press,” in his recent treatise on American Constitutional Law, gives this interpretation of the constitutional guarantee, viz.:
“In respect to the privileges secured by this guarantee, and with regard to responsibility for its abuse, there is no difference between ‘speech’ and ‘the press.’ It is a mistake to suppose that there is a liberty of speech and a liberty of the press, which are in any way different or distinct. The constitutional provision is designed to insure immunity for the expression of opinion. And it makes no difference whatever whether.the opinion be expressed orally or in print. It is to be noticed that the constitutional guarantee here considered does not create any new right not previously understood to belong to the people.” Black’s Constitutional Law, Sec. 164.
“ But the freedom of speech,” says that author, “ and of the press, does not mean unrestrained license. It can not for a moment toe supposed that this guarantee gives to every man the right to speak or print whatever he may choose, no matter how false, malicious or injudicious, without any responsibility for the damage he may cause. The guarantee does not do away with the law of liability for defamation of character. On the contrary, that law is not only consistent with the liberty of speech and of the press, but is also one of the safeguards of those who may use, but do not abuse, this liberty.’’ Ibid.
*1133 In treating of the law of “conditional privileges,” that author says “a publication is said to be conditionally privileged when the author of it is not to be held accountable for its falsity if it was made for good ends and from justifiable motives’; but otherwise, if it was made with malicious intent to injure individuals.” Ibid.
In applying this precept to the case of a newspaper, that author formulates the modern doctrine thus:
“ It has often been claimed that the publishers of newspapers, in view of the peculiar nature of their business of gathering and disseminating news, should’ have a more liberal exemption from liability to the law of libel than persons engaged in other occupations. But this claim has never been conceded by the courts. The estab- ’ lished rule is, that when the publication is made in good faith, in the ordinary course of the publisher’s business, and without any intention to work injury to the reputation of the subject of it, the party injured by the false statement will not be allowed to recover anything more than his actual damages. Ibid. 480.
The author cites: Cooley’s Con. Law, 2 Ed. 293; Detroit Daily Post and Tribune Company vs. McArthur, 16 Michigan, 447; Perret vs. New Orleans Times Newspaper, 25 An. 170.
In the case first cited the court says:
“The law favors the freedom of the press so long as it does not' interfere with private reputation or other rights entitled to protection. And inasmuch as the newspaper press is one of the necessities of civilization, the conditions under which it is required to be conducted should not be unreasonable or vexatious.”
And they further say:
“When the wrong done consists in a libel — which can never be accidental — the publishing is, therefore, always imputed to a wrong motive, and that motive is called malicious. And, in the absence of any testimony showing the origin and circumstances of the publication, it stands before the jury as a voluntary wrong until palliated or excused; while the actual motive, whether intensifying or mitigating the moral guilt, may be shown to qualify it.”
Again:
“There is no doubt of the duty of every publisher to see at all hazards that no libel appears in his paper. Every publisher is, therefore, liable, not only for the estimated damages to credit and reputation, and such special damages as may appear, but also such *1134 damages, on account of injured feelings, as must unavoidably be inferred from such libel, published in a paper of such a position and circulation.” P. 453.
And in the case last cited by Judge Black — Perret vs. New Orleans Times Newspaper, 25 An. 170 — wherein the plaintiff claimed damages on the ground that the defendant had inferentially charged him with having committed a robbery, the court said:
“ We regard the doctrine as no longer controverted, that the publication of any communication * * * which is defamatory and false, subjects the publisher, as well as the author, to damages in favor of the party aggrieved. Circumstances may be shown in mitigation of damages. The law looks to the animus of the publisher in permitting his columns to be used as a vehicle for the dissemination of calumny, whereby the fair character of an individual may be blasted and his business prospects ruined. * * * The law imputes malice in the publisher, from the act of publishing the libel; not malice in the sense of spite, antipathy or hatred toward the party assailed, but the evil disposition, the malus animus which induced him wantonly, or negligently, in disregard of the rights of others, to aid the slanderer in his work of defamation, by the potent energy of the public press — written or printed slander being considered as more pernicious than that uttered by words only.”
These decisions are in strict keeping with the opinions expressed in more recent cases.
In Bigney vs. Van Benthuysen, 36 An. 38, this court said that newspaper editors “are held to the same responsibility with any other person, and malice on their part is conclusively inferred, if the publication is false. It is no defence that it has been copied from another newspaper without comment, or that the source of the information is stated at the time of the publication,” etc.
The court, after citing authorities, puts the proposition in this vigorous style, viz.:
“If an editor or publisher chooses to become the retailer of private scandal, without taking the trouble to inquire into the truth of what he publishes, the law, which is as studious to protect character as the property of a man will hold him to responsibility.
“The rule is not only just and wise in itself, but if strictly and inflexibly adhered to and applied by the courts and juries will greatly tend to the promotion of truth, good morals and common decency *1135 on the part of the press, by inculcating caution and inquiry into the truth of charges against private character before they are published and circulated throughout the community.”
Very much the same language is employed in Staub vs. Van Benthuysen, 36 An. 467.
Having been at the pains to closely scrutinize all the authorities and text writers, both ancient and modern, we find them consistent and uniform to the effect that the publication of statements selected from other journals that are injurious to the reputation or character of private individuals or public officials; or editorial articles favorably commenting thereon, if false in fact are libelous and defamatory, and are presumed to be malicious, and, tberéfore, actionable. The authorities, English as well as American, have generally held the publisher and editor of a newspaper to the -same rigid responsibility with any other person who makes injurious •communications. Malice on his part is conclusively inferred, if the •communications are false, in fact. It is no defence that they have been copied with or without comment, from another paper; or that the source of information is stated at the time, and the information is believed to be true.
The freedom of speech and liberty of the press were designed to secure constitutional immunity for the expression of opinion; but that does not mean unrestrained license, nor does it confer the right upon the editor of a newspaper to print whatever he may choose, no matter how false, malicious or injurious it may he, without full responsibility for the damage it may cause.
The modern rule with regard to the conditional privilege which newspaper publications enjoy is that when the publication is made in good faith, in the ordinary course of the publisher’s business, with good motives and for justifiable ends and without any intention to work injury to the reputation or character of the subject of it, the party injured will be restricted in his recovery to actual damages.
But every publisher is therefore liable not only for the estimated •damages to credit and reputation and such special damages as may appear, but also such damages on account of injured feeling as must unavoidably be inferred from such libel, published in a newspaper of large circulation and position of influence.
As the law looks to the animus of the publisher in permitting his *1136 columns to be employed for the dissemination of calumny, circumstances may be shown in mitigation of damages.
It was upon this ground that our learned brother of the lower court placed his rulings and must have rested his judgment, and the circumstances pointed to as justifying the judgment were that the administration of the government of the city of New Orleans had become so notoriously corrupt that suspicion in the public mind' rested alike upon all those in any manner connected with it and urgently demanded investigation and reform. That the defendant, as a faithful and fearless public journalist, felt in duty bound to-direct public attention to this serious condition of public affairs, and consequently when Orlopp, an important city contractor, made the aforesaid disclosure to other city papers, he deemed it the discharge-of a public duty to make upon them the editorial comment that i& complained of. With all due consideration given to this commendable purpose, we can not hold that the publication entitled “The Den of Thieves” can be considered as' protected by the conditional privilege of the press.
The law is studious to protect the character as it is to protect the-property of a man. This rule is not only just and wise, but if strictly adhered to, and inflexibly maintained and applied by the courts, it-will greatly tend to the promotion of truth, good morals and good citizenship, by encouraging caution, and inquiry into the truthfulness of charges before the damaging publication is made and circulated throughout the community.
In this case no claim is made to the effect that the statements made in the defendants’ editorial were true; but that under the circumstances, he believed them to be true. But he did not personally know the facts related to be true, and instituted no inquiry for the purpose of ascertaining their truth or falsity. The irresistible inference is that the statement was slanderous and libelous and within, the meaning of the law, malicious and, as such, actionable. But we think the defendant is only bound for actual damages, and that they include wounded feelings and a sense of injury and wrong suffered by the plaintiff. We think the judgment appealed from correct and it is affirmed.