LAND, J.
This is a suit for $10,000 damages for an alleged newspaper libel against the plaintiff as a member of the board of administrators of the Tulane University of Louisiana. The case was tried before a jury, and the plaintiff appeals from a verdict and judgment in favor of the defendants.
On August 15, 1906, there appeared in the columns of the Daily States, a newspaper of general circulation, published and edited in .the city of New Orleans by the defendants herein, the following article:
“Affairs of Tulane University.
“(From the Boston Herald, August 8, 1906.)
“ ‘A most unpleasant, and, as it appears, reprehensible, condition of affairs has been developed in respect of Tulane University of New Orleans. The newspapers of the city discuss it with much tenderness, but there appears to be-a practically unanimous sentiment that the institution has been grossly imposed upon and abused by the management or mismanagement of its responsible officers of administration. Tulane University is one of the leading educational institutions of the South, and it has received endowments that give promise of enhancing its importance if they are prudently and intelligently managed. It has obtained from the state landed property in New Orleans which was valued, when prices were very much lower than now, at $200,000. It is also exempted from taxation on all property below $5,000,000. Being thus endowed and favored by the state, in addition to private endowments it had high rank and promise. Dr. E. A. Alderman, now president of the University of Virginia, was for several years at its head, and he ranked among the best-equipped college presidents of the country, and gave prestige to the institution. It has 1,500 or more students, and more than 100 instructors.
“ ‘During last winter a movement was undertaken to obtain for it an annual subvention from the state treasury, and in this way to raise it to the position of the State University. Although there is already at Baton Rouge a recognized State University, the scheme was, we believe, to effect some kind of union of the two, making the Baton Rouge institution an agricultural and technical department of the complete State University. This movement to officialize Tulane University led to an investigation' of its management of the state aid already given to it. It was discovered that it had never rendered an account concerning the use of its endowment, given by the state in trust, and the press insisted that the board of management should make a report of its stewardship. The showing- of facts that was made rather reluctantly was far from indicating that a prudent and wise discretion had been exercised, and one transaction was revealed that has the quality of a scandal and has been visited with severe criticism.
“ ‘There was a certain parcel of improved property for which some time ago a demand appeared. A citizen offered to purchase it for a sum specific in order to devote it to business purposes. The question to be considered, of course, was whether its sale at the price was advantageous to the university. The price was by some not deemed sufficient, in view of the fact that real estate in that quarter was appreciating in value. After protracted consideration, in which the person offering to purchase showed a wholly commendable purpose to do what was *597 fair, it was finally voted by the board of managers, with his approbation that the property should be put in the market by advertisement, he and the board practically agreeing that his proposal should rest in abeyance until it should appear by responses to the advertisement whether the university could dispose of the property to better advantage.
“ ‘While the subject was thus temporarily disposed of, a meeting of the board was called without any notification to this person, at which without any notice of such purpose it was voted to lease the properly for a term of ninety-nine years to a certain party at an annual rate which public opinion esteemed to be ridiculously low, and without any provision for reappraisal and readjustment of the condition during the uncommonly long term. The parson to whom the lease was thus summarily voted was, we understand, not well known; in fact, he was either a dummy or had but a small interest in the matter, the real parties being two relatives, a son and a nephew, if our memory serves, of the president of the board of managers. Within the short period that has since elapsed, it is demonstrated that the lease was a highly profitable bargain for the lessees and a very unfortunate one for the University. It is altogether likely that in a growing city like New Orleans the property will in the life of three generations make the fortunes of those who have secured it.
“ ‘We hazard nothing in saying that such malversation on the part of trustees of an educational institution, accentuated by such favoritism to the family of one of them would here result in a storm of righteous indignation that would forever debar those who committed it from public respect and confidence. But the president of the board of managers answers all criticism by defying anyone to show that the action was not “legal.” It will occur to most people of uprightness to say that it is an action justly comparable with the actions of those former officials of the great New York life insurance companies, who used their offices to enrich themselves at the expense of policy-holders. The faculties and students of Tulane University for a hundred years will in a just sense be the victims of this deed of selfish rapacity. Men who would do such a thing would seem quite capable of robbing an orphan asylum or a church if they thought they could do it and escape the penalties of the law.
“ ‘Still worse, a committee representing in some sense the university, having investigated the matter and reported the facts essential as we have recited them, have declared that nothing wrong was done. This is a finding that impugns their own character in the forum of probity and morals. It is condemned in earnest language by the city newspapers, which are proud of the university and jealous of its good name and prosperity. They insist that the whole business shall be thoroughly investigated by a disinterested legislative committee, and that not another dollar of public money shall be intrusted to the university until the scandalous contract shall be canceled and a new board of managers chosen to conduct its financial interests. In this demand they are wholly reasonable, and we trust that they will succeed. A clearer case of mercenary graft by abuse of a fiduciary office we do not recall. It may be what a distinguished Tammany politician calls “honest graft,” because it was accompanied without violation of the written criminal statutes, but it rankly violates the rule of right and faithful service which gentlemen who have a nice sense of personal honor are careful to observe. The secret, stealthy and ungenerous manner in which the action was accomplished, without affording any disinterested party an opportunity to offer better terms, or, we may add, fair business terms, for a lease of this peculiar character, is a sufficient condemnation of the proceeding. It has the aspect of a conspiracy against Tulane University by those who were charged with the duty of protecting its interests and rights. We are sincerely sorry for Tulane University, betrayed by its guardians, and hope there will arise a virtuous indignation of the people that will compel restitution of its property and prevent another similar misfortune to any educational institution in the state.’ ”
In the same paper, on the same page and on the same day, there appeared as a leading editorial the following:
“A Severe Arraignment.
“We print on our editorial page to-day an editorial article that appeared a few days ago in the Boston Herald, one of the oldest, strongest and most independent newspapers in New England, concerning the management of the affairs of Tulane University, as developed by the discussion of the Baronne street lease. While the administrators may complain of one or two slight verbal inaccuracies, the story of that transaction is told with dispassionate frankness, and the editorial comments of the Boston newspaper are much more severe than any that have been made by the States.
“It shows how this astonishing transaction is viewed by unbiased critics, who are not influenced in their appraisement of deeds by the personal equation, which is so apt to warp the views and opinions of men. The eminently respectable character of the gentlemen who compose the Tulane board have made, it extremely difficult for citizens of New Orleans to view the matter as they would view it should the incident take place in New York or Boston; hence, the personal equation has tempered criticism, and to a very great extent softened and toned down the individual judgment.
“It is an easy matter for us in New Orleans to denounce without reserve the Alexanders, the McCalls and the McOurdys, because there is no personal attachment or provincial restraint upon us; but, when the same character of offenses are committed here by our ‘oldest and best,’ *599 ■charity is mixed up in undue proportion in the formation of judgment and in the expression of opinion. The Boston Herald, being printed more than a thousand miles away from New Orleans, ■and viewing the Tulane board of administrators merely as several men among the .eighty millions who compose the American commonwealth, discusses this action just as a citizen of New Orleans might be expected to discuss, without bias or prejudice, the acts of the board of governors of Harvard University. In its discussion of the Baronne street lease, the States has said nothing so severe as is contained in this dispassionate analysis of that transaction by the Boston Herald, a fact which ought to convince even Judge Fenner of the absurdity of his charge to the effect that the criticisms of the States have been ‘absurd’ and that they are ‘insulting to the living members of the board and to the memory of the dead members.’ If the studied temperateness of the States’ criticisms are absurd and insulting it would be interesting to know what the judge would think of the dispassionate frankness of the Herald’s criticism.
“The trouble with Judge E’enner and his board is that they live and move in an artificial atmosphere created by their own absurd assumption that men of their kind can do no wrong; that the code of morals was made for men of meaner clay, and that their exalted reputations give them license to fracture the Ten Commandments, or any other of the canons defining the obligations imposed by good morals. Blindly persisting in this fatuous course, they have added to tlioir original offense by formally declaring a notoriously immoral transaction to be highly proper and moral, and they are preparing to prove that it is so, by packing a court to try the ease against themselves, and, with unexampled generosity, they are voting the money belonging to Tulane Universit3r to pay the court of their 03vn creation for defending and protecting fhem.
“Poor old Cotton Mather went down to his grave stoutly defending the righteousness of his course in burning witches at the stake. Judge E’ennor and the members of his board, reversing the maxims of morality and defying the protests of the people, seem determined to pursue their ill-starred and most indefensible course until the thunders of the people’s righteous indignation shall S3veep them and their miserable lease into ignominious retirement. IVe grieve to see such perverse moral obtuseness in gentlemen who have deservedly stood so high in tliis community in the past. Day after day the States has, calmly and rvithout passion, written the story of the board’s maladministration, ivith the sincere hope that the unvarnished facts, dispassionately stated, would lend them to see their error and to make reparation.
“D'U'ing all the discussion we have striven to be fair to Judge Fenner and the board, but not a hand has been raised in all this state in defense of the Baronne. street transaction. Do these gentlemen think that, in a chivalrous community, the States or any other newspaper could be ‘insulting to the living and to the dead members’ of so highly distinguished a board for all those weeks, without a single voice in all this city of 300,000 souls being raised in protest? Doesn’t that fact alone show the temper of the community and the estimate which the people have placed upon that transaction? Why should the board persist in ‘kicking against the pricks’ and tempting fate? There is a very distinct line between firmness and mere obstinacy, between persistence in a right course and dangerous pigheadedness. Let the board read the article clipped from the Boston Herald and get an idea of the estimate put upon its course by an unbiased and very able critic.”
Defendants’ pleadings consist of a demurrer, followed by a general denial of all the averments of the petition, except such as are expressly admitted. The answer admits the publication of the article from the Boston Herald, but denies that it is libelous, and especialy that it is a libel on the plaintiff in this suit, and that he has suffered any damage by reason thereof. They deny that plaintiff is named in said article, or so referred to by any collocation of words as to identify him with the statements, comments, and strictures made in said article. Defendants further aver that said publication was made of and concerning a corporation named the “Board of Administrators of the Tulane Educational Fund,” and not of and concerning the plaintiff or any member of said corporation except its president, and that at the time of said publication defendants were ignorant of the membership of said corporation.
Defendants further deny that in the republication of said article they were actuated by malice or any intent to injure the plaintiff or any member of said corporation, but aver that they made the same from a sense of duty to the public, and in the conviction that it was not only their duty, but their privilege and right as publishers of a public journal, to reproduce said article for the information and instruction of the people upon a subject deeply affecting their interests, the interests of the state, and the *601 interests of the chief institution of learning within the state. “And they aver that all the material statements of fact and inferences drawn therefrom are true.”
The answer then, going back to 1835, when the Medical College of Louisiana was established, gives the history of that and other institutions which succeeded it until their merger into the Tulane University of Louisiana by Legislative Act No. 43, p. 48, of Laws of 1884, which was ratified by constitutional amendment in 1886. The answer further sets forth that by Act No. 94, p. 98, of Laws of 1890, the board of administrators of the Tulane Educational Fund was authorized to lease, sell, and dispose of any part of the immovable property transferred to it by the state, provided that the full amount of the proceeds be reinvested in immovable property in the city of New Orleans. The defendants further averred that the board in 1893 authorized the sale of the property for not less than $150,000, and thereafter received and rejected two offers of $125,0.00; that in June, 1896, the said board placed said property in the hands of Curtis & Walmsley, real estate brokers, for sale; that on December 11, 1896, the said board received an application from Dr. C. Edmund Kells, a prominent citizen of New Orleans, of well-known financial ability for an option for a period of 30 days for the purchase of said property for the sum of $150,000 cash, and the chairman of the real estate committee received a letter from Dr. Kells urging that for reasons stated the said option should be granted; that on the same date the said committee was informed by Curtis & Walmsley that a member of the said firm was in the city of Chicago pressing a project to lease the property for a term of 99 years at an annual rental of $10,000; that said board being informed of the said application of Dr. Kells for an option, and of the said project of Curtis & Walmsley, then resolved that the real estate committee be authorized and directed to advertise for proposals to be-submitted by the 1st of February, 1897, for' the disposition of the property on Baronne, Common, and Dryades streets (exclusive of Tulane Hall), either for a lease thereof for' 99 years or by sale.
The answer further avers that notice of this resolution was communicated to Dr. Kells, but on December 18, 1896, a special informal meeting of said board was held to consider a proposition submitted in the-name of Thomas Nicholson to lease said property for 99 years at a rental of $10,000-per annum, payable in advance; that at said meeting Charles E. Fenner, the president, informed said board that his relative Sam Henderson, Jr., was interested in said proposition, and that his son Charles PayneFenner would also be interested therein; that said board then and there resolved that said Nicholson be informed that the proposed price and terms of payment were satisfactory, and instructed its committee to take-no action until further instruction relative to the advertisement of the property; and that the said board, without notice to Dr. Kells and Curtis & Walmsley, and without advertising for proposals according to its resolution, did on March 11,1897, by Charles. E. Fenner, president, execute said lease to Nicholson of said property for the term of 99 years from October 1, 1897, at an annual rental of $10,000, and gave immediate-possession.
The answer further avers in substance that Charles E. Fenner, Sam Henderson, Jr., and Charles P. Fenner were members of the law partnership of Fenner, Henderson &. Fenner, and that the three were joint owners of an office building known as the “Medical Building,” numbered 124 and 126 Baronnestreet, and that, after Dr. Kells made his application for the option as above stated,. Sam Henderson, Jr., suggested to Charles- *603 E. Fenner a project to obtain a lease of ■said University property to said Henderson, diaries Payne Fenner, and Thomas Nicholson, John S. Rainey, and O. M. Soria for .a term of 99 years at an annual rental of $10,000; that said Charles E. Fenner immediately expressed approval of said project, and referred said Henderson to the chairman of the finance and real estate committee of said board for negotiation.
The answer further sets forth the subsequent transfer of the leased premises to the Tulane Improvement Company, organized by the said Nicholson, Henderson, Charles P. Fenner, John S. Rainey, and C. M. Soria; that one-third of the stock of the concern ■stood in the name of Henderson for the equal account of himself and Charles P. Fenner, and that in April, 1897, one-third of this third, or one-ninth of the whole, was transferred by Henderson to the wife of Charles E. Fenner, and was paid for out of her personal funds, but that said stock remained in the name of said Henderson for a long time thereafter. It is further charged in the answer that Walter O. Flow■er, a member of the board, in 1899 purchased the stock which had been issued to John S. Rainey for account of himself and C. M. Soria, and that subsequently Charles E. Fenner purchased at par $10,000 of bonds issued by said Tulane Improvement ■Company, and that Walter C. Flower purchased at par $30,000 of the same issue of bonds.
In connection with the Nicholson lease, it is charged that the board warranted the exemption of the property from all state, parochial, and municipal taxes for the whole .term of the lease. The answer, however, contains an admission that all the property .of the Tulane board is exempt from such taxation under the act of 1881.
The answer further avers that the board was charged with and had knowledge of the fact that its president and his relatives and partners owned the Medical Building; that it was to their common interest that the option sought by Dr. Kells with the view of erecting a rival building should not be granted.
The answer further charges that the action of the board in the premises was favoritism to the individual interests of a member of said board, to the prejudice of the interests of the University, contrary to the duty of said board, and was maladministration of the trusts with which said board was charged.
The answer further charged that Nicholson, the lessee, was a party interposed, to the knowledge of the president of the board.
It is further charged that the lease was in legal effect tantamount to a sale, and that the board had no power or authority to warrant the lessee and his assigns against taxation.
The answer contains other averments of matters subsequent to the lease that need not be now mentioned, and winds up with the charge that the actions and doings of the board relative to said lease—
“were against good morals and the policy of the law, injurious to the trust they were charged by law to administer, and were acts of maladministration, malversation, and unfaithfulness to duty on the part of said board, and on the part of several members of said board who participated in and consented to said actions and doings.”
Act No. 94, p. 98, of Laws of 1890, authorized the Tulane board to lease, sell, and dispose of any part of or the whole of the immovable property transferred to it by the state, and to make title thereto:
“Provided that the price and terms of said transfer shall be first approved by the Governor of the state.”
In case of a sale or other disposition, the act provided that the full amount of the price should be reinvested in immovable property within the city of New Orleans, and, in case of a lease, that the rent received should be devoted exclusively to the purpose of the *605 University. The board was also' authorized, in its discretion, to demolish the old buildings and to construct in their place buildings for commercial or other purposes.
In 1893 the board, having decided to remove the Tulane University to grounds on St. Charles avenue purchased for that purpose, passed a resolution authorizing the real -estate committee to sell all the property then ■occupied by the University (except the Tulane Hall) at not less than $150,000, or, including the janitor’s house and Tulane Hall, at not less than $250,000. On May 9, 1895, the board passed a resolution authorizing a lease of the property (exclusive of Tulane Hall) for not less than $10,000 per annum. In June, 1895, Robinson & Underwood offered for said property $125,000, $25,000 cash, and the balance in 10 equal payments, with 4 per ■cent, interest. The board declined this offer, but authorized a sale for the price of $150,-■000, $25,000 cash, and the balance deferred pajunents, with 5 per cent, interest payable annually. In December, 1895, Robinson & Underwood renewed their offer of $125,000. which was declined. In 1896, the property was placed in the hands of Curtis & Walmsley, real estate agents, for sale or long lease. But no results followed.
On December 11, 1896, at a meeting of the real estate committee, a letter of date December 5, 1896, written by C. Edmund Kells, Jr., and addressed to the board, was produced and considered. In this letter Dr. Kells applied for an option to purchase for .a period of 30 days for the price of $150,000. The committee recommended to the board that it be vested with the power to grant the -option asked by Dr. Kells on the 15th January next, if in the meantime no other desirable arrangements with regard to the property should have been developed. It seems that Curtis & Walmsley had a project on foot to lease the property for a term of 99 years upon a valuation of $200,000 at 5 per cent. per annum. At the same meeting of the board a letter from Dr. Kells was read to the effect that he had plans of his proposed building drawn, an estimate of the cost of the same made, and that the time to lay the matter before the people he wished to interest in the matter was propitious. The letter concludes as follows:
“150,000 is no small sum to raise you know, and that much now is preferable to more in the far distant future.”
After a lengthy discussion a resolution was passed directing the real estate committee to advertise for proposals for the lease for 99 years, or the sale of the property to be submitted by February 1, 1897. On December 15, 1896, Dr. Kells was notified by the secretary of this action of the board.
On December 18, 1896, an informal meeting of the board was called to consider the proposition of Thomas Nicholson to lease the property for 99 years at an annual rental of $10,000 payable in advance, the contract to contain the usual clauses in leases of 99 years used in Chicago and other cities.
The minutes contain the following recital;
“Judge Fenner also -said that Mr. Sam Henderson, Jr., his relative and partner, being interested in the proposition for lease of the Old University Building, that was to be submitted at this meeting from Thos. Nicholson, he desired his position well defined in the matter, and would like the board to allow him not to take part in the deliberations, and to retire.
“A general discussion followed and it was the sense of the meeting that there was no impropriety in Judge Fenner presiding at the meeting.”
A motion to that effect was put and unanimously carried.
After discussion a resolution was adopted that Nicholson be informed that the board was satisfied with the price offered and the term of payment, and that, if the other details could be satisfactorily arranged and the consent of the Governor obtained, the board would be • ready to conclude the contract. The lease was drafted, and was approved at *607 a meeting of the board held on January 28, 1807. It was finally executed and approved by the Governor of the state on March 11, 1897.
The fact that the property greatly enhanced in value in subsequent years has nothing to do with the case, beyond tending to show a want of prophetic foresight in the board of administrators.
The published articles charged, to use the language of defendants’ counsel:
“That the board of administrators had been unfaithful to their trust ; that in violation of their duty to Tulane University, (they) had so disposed of the property held by them in trust, as to injure the University to the advantage of the president of the board, his relative and partners.”
The gravamen of the charge is official favoritism, and misconduct to the prejudice of the University.
In the first place, the evidence does not «how that a more favorable disposition of the property could have been made at that particular time. There is nothing to show that Dr. Kells, if given an option, would have purchased the property for $150,000, or that such a sum was preferable to an assured revenue of $10,000 per annum. A large majority of the members of the board testified on the trial of this case that the Nicholson offer was the best the board had ever received, and that they all rejoiced at the consummation of this loase. The testimony of a number of independent witnesses acquainted with the facts tends to show that, at that time, the Nicholson lease was considered a good bargain for the board and a poor investment for the lessees. The real estate agents of the board had endeavored in vain to lease on the same terms, and the board had never been offered more than $125,000 for the property. At the time there was no proposition pending save the application of Dr. Kells for an option, and there was no assurance that he would have exercised the option if it had been granted to him. The most that can be said on the undisputed facts of the case is that the board committed an error of judgment in not holding on to the property. The Governor who approved the lease certainly considered the price and terms as fair to the University.
The record shows that Judge Fenner informed the board that his relative and partner, Mr. Henderson, had an interest in the lease. On the trial of the ease the secretary and Judge Fenner testified that the latter also said that his son would have or probably have an interest in the lease. There was nothing in the statements of Judge Fenner to indicate to the board that their fellow member and presiding officer had any personal interest whatever in the transaction. A charge of favoritism to a particular individual necessarily implies actual knowledge of his interest in the subject-matter. • Now, the evidence in the case is to the enect that Judge Fenner had no personal interest in the lease to Nicholson. That Judge Fenner and his wife subsequently acquired an interest in the subject-matter in no manner affects the bona lides of the members of the board who voted to accept the proposition made by Thomas Nicholson. The most that can be said on the evidence is that Judge Fenner, being the part owner of an omce building across me street, had an interest in preventing the erection of a similar building on the Tulane property. There is no evidence that such collateral interest, if known to, influenced any of the members of the board.
On the whole case, we are clearly of opinion that the plea of justification tendered by the defendants has not been sustained by the evidence.
The charge that the board has been guilty of maladministration in not seeking to annul said lease and to recover the property assumes the invalidity of the lease, a question which cannot be determined in this suit for *609 want of proper parties, if for no other reason. We express no opinion as to the validity of the lease. The question in this case relates to the motives of the members of the board, and not to the legality of the corporate action. The evidence fails to show that the members of the board acted from improper motives as charged in the libel.
The Boston Herald retracted the offensive article and apologized. The defendants published the retraction, but have continued to affirm the truth of the charges made in said article.
Malice on the part of a publisher of statements selected from other journals that are injurious to the reputation or character of private individuals or public officials is conclusively inferred, if the communications are false in fact. Fitzpatrick v. Publishing Co., 48 La. Ann. 1135, 20 South. 173. The animus of the publisher affects only the question of damages, and, where no special damages are proven, plaintiff is entitled to such damages on account of injured feeling as must unavoidably be inferred from such a libel. Id.
The freedom of the press consists in the right to print without any previous license but subject to responsibility therefor to the same extent that any one else could be responsible for the publication. 25 Cyc. 406.
The privilege of fair and reasonable criticism of public men does not embrace the right to publish false statements of fact, or to falsely impute to them malfeasance or misconduct in office. 25 Cyc. 402, 403.
That the plaintiff was not named, and that the defendants did not even know that he 'was a member of the board, is no legal excuse, but may be considered as a mitigating circumstance. The libel not only assailed the corporate action of the board, but impeached the integrity of every individual member who participated in the proceedings.
The wholesale charge of official favoritism and misconduct pointed to all the members of the board who participated in the proceedings. These gentlemen were citizens of more or less prominence in the community, and their official connection with the Tulane University was well known. It is manifest that the plaintiff, although not named in the libelous publication, was necessarily one of its objects, and it must have been so understood by those who knew that he was a member of the board. 25 Cyc. 352, 362, 363.
The evidence shows no actual malice on. the part of the defendant, and no special damages sustained by the plaintiff, but the latter is entitled, at least, to nominal damages.
Assuming that the plaintiff is seeking the vindication of his good name rather than to enrich himself at the expense of the defendants, we fix the damages in the sum of $50.
It is therefore ordered that the verdict and judgment below be reversed, and it is now ordered that the plaintiff, John B. Levert, do have and recover of the Daily States Publishing Company, Limited, W. C. Chevis, and Robert Ewing, in solido, the full sum of $50, with legal interest from this date, and costs of suit in both courts.
BREAUX, C. J. I concur in the decree.
MONROE, J., recused.