## A. H. BELO & CO. v. LOONEY. (No. 1629.)

(Court of Civil Appeals of Texas. Texarkana. June 22, 1916. On Appellee's Motion for Rehearing, Jan. 18, 1923.)

1. **Libel and slander** ⚖️100(2)—**Not necessary to allege or prove special damages.**

Under Vernon's Sayles' Ann. Civ. St. 1914, arts. 5595–5597, as to libel, it is not necessary to the right to maintain action for a publication not libelous per se to allege or prove special damages.

2. **Libel and slander** ⚖️123(2)—**Unambiguous language not subject to interpretation.**

Under Vernon's Sayles' Ann. Civ. St. 1914, arts. 5595–5597, as to libel, if the language of a publication is unambiguous, it is the court's duty to construe its meaning and determine whether it is libelous or not, without reference to the meaning attributed to it by the plaintiff or defendant.

3. **Libel and slander** ⚖️101(4)—**Plaintiff must show newspaper publication as to his official acts was unfair, or made with actual malice.**

Under Vernon's Sayles' Ann. Civ. St. 1914, arts. 5595, 5597, as to libel, where plaintiff's cause of action is predicated upon newspaper comment or criticism of his official acts as a public official, he has the burden to prove either that the comment or criticism, when considered with reference to the official acts commented on, was unreasonable and unfair, or

that the publication was made with actual malice.

4. **Libel and slander** ⚖️48(2)—**"Comment and criticism" of official acts may impute to the official an unworthy motive.**

Under Vernon's Sayles' Ann. Civ. St. 1914, arts. 5595, 5597, "comment and criticism" of a public official's acts may go so far as to impute to him an unworthy motive, such as dishonesty, in the performance of such acts, and yet not be libelous.

5. **Libel and slander** ⚖️10(3)—**Newspaper criticism of official acts of Attorney General held not libelous per se.**

In action against newspaper for libel consisting of publications regarding plaintiff's acts as Attorney General, the publications held not libelous per se.

Hodges, J., dissenting.

Appeal from District Court, Hunt County; A. P. Dohoney, Judge.

Action by B. F. Looney against A. H. Belo & Co. Judgment for plaintiff, and defendant appeals. Affirmed on appellee's motion for rehearing, to conform to answer of Supreme Court to certified question, 246 S. W. 777.

This was a suit by appellee against appellant, a corporation, for damages, which the former claimed he had suffered because of the publication by the latter in its newspapers, the Galveston Daily News and the Dallas Morning News, of certain matter of and concerning acts of his as Attorney General of Texas, which, he alleged, was libelous. In his petition appellee alleged that he resided, and for 33 years had resided, in Hunt county; that the Thirty-Third Legislature passed a bill authorizing the Missouri, Kansas & Texas Railway Company of Texas to lease and purchase certain other named lines of railway and consolidate same with its own line of railway; that, when said bill was presented to the Governor for his approval, same was by him transmitted to appellee as Attorney General, with a request that he, as Attorney General, advise him, the Governor, whether the bill was constitutional or not; that as Attorney General he advised the Governor that the bill was unconstitutional; that thereupon the Governor vetoed same; and that afterwards the Legislature passed same over the veto, and same became chapter 11 of the General Laws passed by said Legislature. He further alleged that on March 4, 1913, he, as Attorney General, in the name of the state, commenced a suit in the district court of Travis county against the Missouri, Kansas & Texas Railway Company of Texas and others, to enjoin them from consolidating their lines of railway as authorized by said bill, on the ground that the act was unconstitutional. Appellee further alleged that on March 5, 1913, he, as Attorney General, in the name of the state, commenced a suit in the district

⚖️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

court of Hunt county against the Magnolia Petroleum Company, the Standard Oil Company of New Jersey, and others, for alleged violations of the anti-trust laws of Texas. He then alleged that appellant thereafterwards, with reference to the last-mentioned of the two suits, wantonly and maliciously published in its said newspapers articles as follows:

1. Editorial published March 8, 1913:

"A careful reading of the petition filed by Attorney General Looney in his suit against several oil companies has failed to disclose any allegation that the oil business is monopolized either by these defendant companies or any other companies. Their chief offense seems to be that they have a blood relation to one another, or a financial relation with the Standard Oil Company as the grandfather of them all. Also they seem to be accused of having somehow parceled out the state among themselves; that is, to agree that one will not sell in a field occupied by another member of the family. If there is no monopoly of the oil business in this state, if, on the contrary, there is competition, whether among the members of this alleged Rockefellerian oil family, or among its members on the one side and oil companies of other breeding on the other—if, in short, there is competition and not monopoly in the oil-selling business of Texas, we can see no occasion whatever for the Texas anti-trust law to become excited, much less indignant. *Maybe, if one could go deep enough, one would see that the grievance is, not that there is no competition, but that there is too much, wherefore the desirability of having the anti-trust law drive some oil companies out of the state that the others may not be forced to lead so strenuous a life. There are nine ways to skin a cat and at least two uses to be made of an anti-trust law.*"

II. Resolutions of Corsicana Commercial Club, published March 27, 1913:

"Condemn Attorney General.

"Corsicana Commercial Club Protests against Prosecution of Magnolia and Corsicana Companies.

"Corsicana, Tex., March 25.—The Corsicana Commercial Club this afternoon adopted the following resolution:

" 'Be it resolved by the Commercial Club of the city of Corsicana:

" 'That we are committed to the enforcement of the laws of our state in a spirit of justness and fairness and will use our best efforts to secure the same.

" 'Be it further resolved that we express no opinion as to the guilt or innocence of the Magnolia Petroleum Company and the Corsicana Petroleum Company of the acts of which the Attorney General claims they are guilty.

" 'Be it further resolved, that we are not in sympathy with, but strongly condemn, the procedure of the state, through its Attorney General, in bringing said companies to trial. *It has the appearance of lynch law or of a mock trial where the only effort is to procure a place where injustice may be worked out.* It is not usual for an officer who is seeking to enforce the law to select an unusual and arbitrary place as a background for his act. It is not usual for a court to take from any citizen his property and put it in the possession of another without

notice or a chance to be heard, but both of these things have been done, and we view it as an assault on our most sacred right to an impartial and legal trial. The Magnolia Petroleum Company and the Corsicana Petroleum Company have transacted business among us for a number of years and are managed by men whom we know, respect, and have confidence in: they are our friends and neighbors and we mingle with them day by day, and their conduct inspires our respect and commands our confidence. We can see no reason why the companies or their stockholders and officers should be subjected to such *unjust, unusual, and arbitrary treatment* that puts them to great costs, deprives them of the control of their property and humiliates them before their fellow citizens by prejudgment.

" 'The property of said companies is in Texas and gives employment to a number of our citizens; pays large taxes to our state and advances the interests of many people and the state, and we declare that it should receive fair treatment when brought to the bar of justice.

" 'We are unalterably opposed to such *unjust and reprehensible legal proceedings* and we petition the Legislature of the state of Texas to prevent by suitable legislation the appointment of receivers without notice and the power to bring suits in remote and unusual places.' "

III. Article from Financial World, published April 10, 1913:

"Crushing an Oil Competitor.

"Holland S. Reavis, editor of the Fuel Oil Journal of Houston, Tex., *has made some significant revelations touching the motives behind the latest suit brought in Texas* to oust the Magnolia Petroleum Company from Texas. The suit was brought under the anti-trust laws of Texas and Mr. Reavis asserts that the Attorney General had his own banker appointed receiver of this company, which is a legitimate competitor of the Texas Company and the H. Clay Pierce Oil interests. Good legal talent has assured Mr. Reavis that the company has not in any way violated any state or federal statute. The Attorney General's own law partner was named as counsel for the receiver.

"Weeks before the suit was filed, Mr. Reavis asserts he had information from the manager of the Magnolia that the company was going to extend its business into Oklahoma teritory, *which territory is now controlled by Pierce and the Texas Company. A survey for a pipe line was started about two weeks ago, and the next day the suit was instituted.*

"This whole proceeding is quite Gates-like in its method and we agree with the wide-awake and public-spirited editor of the Fuel Oil Journal when he says:

" 'There is absolutely no public sentiment behind the prosecution of the Magnolia and Corsicana Companies.

" '*But there is behind it this combination: The active efforts, the influence, the scheming and the wire pulling of two competitors of the Magnolia Company; two competitors who want to see the Magnolia Company put out of business; two competitors who would be the chief beneficiaries if this result were accomplished*—which it will not be.

" '*This is the combination that constitutes the*

*great moral force behind the suit against the Magnolia Petroleum Company. A spectacle to make the gods weep!*

" 'Only a few weeks ago the then Attorney General of the United States, Mr. Wickersham, discovering the fine Italian hand of one of these competitors in the proceeding at Dallas, by which indictments were returned against the Magnolia Company and its officers, ordered all the indictments dismissed because they were groundless.'

*"The citizens of Texas should ask a few questions touching the remarkable zeal of the Attorney General of Texas in this case.*—Financial World."

### IV. Editorial published April 23, 1913:

"Unfair Procedure in Magnolia Petroleum Case.

"The Beaumont Chamber of Commerce, following the action of the Mexia Chamber of Commerce, has been considering the course of the Attorney General in throwing the Magnolia Petroleum Company into the hands of a receiver pending the determination of a suit he has instituted to oust that company from the state for alleged violation of the anti-trust law. Like the Mexia Chamber of Commerce, this Beaumont body of business men, while venturing no opinion as to the merit of the suit, expresses its regret that the Attorney General should have thought it proper to take such summary and drastic action in a proceeding that is so far wholly ex parte. It thinks that such hasty action is 'calculated to do great harm, not only to the defendants but to the business interests of the state, as it will have a tendency to deter the investment of capital in business enterprises in Texas.' The resolutions adopted conclude with the recommendation that a committee be appointed to study the subject of our anti-trust law for the purpose of determining whether a bill cannot be devised which, while being no less protective of the people, will safeguard corporate capital from such arbitrary procedure as has been taken in this case.

"It is surprising to the News that the commercial interests of the state have not manifested a greater concern over this matter, for it believes, with the Beaumont Chamber of Commerce, that the course of the Attorney General with respect to the Magnolia Petroleum Company must not only have a 'tendency' to injure the state, but must have that consequence positively and most perceptibly. One has only to consider the undisputed facts of this case to appreciate how abjectly our anti-trust law exposes corporations to the mercy of a single individual and what gross injustice it is not only possible but easy to inflict under its provisions. So far as the News has been able to discover from a reading of the state's petition in this suit, it is not pretended that the oil producing and selling business in this state is monopolized by this or any other corporation, doubtless for the simple reason that it is a notorious fact, within the observation of every one, that the competition in this business is sharp. Indeed, if we should consult our self-interest and look somewhat into the future, we should probably conclude that we have more reason to restrain the competition that exists than to wish to intensify it, for the competition which exists seems very like the kind that ends in the survival of one company alone, and therefore the establishment of that monopolization which it is nominally the purpose of the law to prevent. It is not complained in this petition, so far as we have been able to discover, that this or any other company is practicing extortion. The chief if not the only offense charged to the Magnolia Petroleum Company is that it is owned and controlled by the Standard Oil Company, which is outlawed from Texas.

"Whether this is true or not, the News does not pretend to know. Assume it is true, and yet it does not follow necessarily, if common sense is to guide our reasoning, that this would be a condition which should greatly excite the people of the state. For with the Standard Oil Company, or one of its offspring, doing business in the state side by side with one or more other companies not related to it, we are assured of a more effective competition than we could be quite certain of if it were not engaged in business here. Indeed, *it is by no means fanciful to suspect that it is the very effectiveness of this company's competition that is the fundamental cause of its present predicament*; that, in other words, *the Magnolia Petroleum Company is less the victim of its sins than of the jealousy of rivals, which would be glad indeed to be relieved of the competition it subjects them to.*

"But one need not consider what are the probable intrinsic merits of the suit to perceive that there is a *summary and ruthless spirit* in the proceedings against it that would impose injustice on it, even if it were guilty of more and graver offenses than the Attorney General charges to it. With very little notice, if practically any, the Attorney General prepares his petition, and hies him to his home town, and there before a friendly judge has one of his neighbors appointed to take charge of the company's business and a million or more dollars' worth of its property. *This is essentially lynch law.* The company has the control of its own business and property wrested from it without having had any more opportunity to answer the charge made against it than is given to a suspected negro rapist. At some time in the future it will get a chance to reply; but when? Maybe in a year, more likely two, while it may count itself not unlucky if within three years it is able to get a final adjudication of the charges lodged against it. Meanwhile, it is denied the control of its own affairs, and must, as much if proved innocent as if proved guilty, sustain the loss of the fat fees and emoluments that will be pocketed by friends and neighbors of the Attorney General, to say nothing of that probably greater loss of business it is not unlikely to suffer.

"*The injustice of such a procedure is too palpable, flagrant and flagitious* to be denied by any one whose moral sense is not chloroformed by his prejudice against corporations. Indeed, to call such a procedure merely unjust is to flatter the ethical quality of it; *for it more nearly approximates the conduct of the highwayman*, a fact which is not much obscured by the circumstances that it is done in the name of the state and by warrant of its laws. Nor can it be less obvious to unclouded minds that if the law, in letter and spirit, warrants such a procedure, then we have on our statute books an enactment that is a distinct and imminent menace to all corporate capital; for however zealously any one of them may strive to obey the law, it cannot indulge in the certainty at any moment that

the control of its property and business will be not be seized by the state and administered for an indefinite length of time at the pleasure and to the profit of friends of an ambitious politician. The columns of the News will testify that it has had little or no part in the cry, now and then raised, that the laws of Texas are hostile to foreign capital invested in the state; it has had, indeed, little patience with a propaganda which, it has thought, was more likely to injure the state than the laws which made the subject of the outcry. But can any one doubt that such possibilities as have been disclosed by this proceeding against the Magnolia Petroleum Company are capable of doing infinite injury to the state—not only capable, but certain to have that malign consequence?

"The News doubts if there is any duty which presses more pertinently on the attention of the authorities and people of Texas than this of revising a law which makes the infliction of such injustice possible and that entails consequences so damaging to the best interests of the state. We need a law which will forbid and punish corporate wrongdoing, and punish it condignly, or, rather the individual directors who order the corporation's wrongdoing. We need a law which will punish those specific acts which oppress or tend to oppress the people of the state. *What we most preeminently do not need, and what we have the most urgent need to get rid of, is a law which enables one man aspiring to fame and office to terrorize a corporation, if for no other reason than that its form, complexion or affiliation is repugnant to his sense of corporate loveliness.*"

And with reference to the first mentioned of the two suits, wantonly and maliciously published in its said newspapers articles as follows:

V. Editorial published November 6, 1913:

"Hindering Texas with Spiteful Litigation.

"Mr. Looney's communication, which we printed yesterday, is both interesting and instructive. It was worth its space even in a paper having more than the ordinary run of 'big news.' One who reads it attentively will be at no loss to understand *the spirit of the suit* Mr. Looney has instituted against the Katy. Mr. Looney puts much stress on the fact that the News is published by a corporation. It can hardly be thought a very notable fact, since every newspaper in Texas of any consequence is published by a corporation, and that Mr. Looney is at such pains to emphasize it can only remind one *of the prejudice he has of all corporations, a prejudice that is a large part of his motive in suing the Katy.*

"One of Mr. Looney's complaints is that the News printed a dispatch from Abilene stating that five hundred residents of that city had petitioned him to dismiss the Katy suit. Mr. Looney says that by actual count there were only eighty signatures. The News has not seen the petition. What it printed concerning it was a report sent to it by its correspondent. It printed that report precisely as its correspondent wrote it. An inquiry which it was moved to make by Mr. Looney's complaint has brought forth the statement from Mr. Fred T. Wood, who is secretary of the Young Men's Booster Club of Abilene, that it was he who informed the News' correspondent that the petition carried five hundred signatures. He adds that if it did not carry five hundred signatures it was because it was not presented to that number of residents. However that may be, this explanation, which is given more fully in our news columns of this issue, must make it clear, even to Mr. Looney, that this misstatement as to the number of signatures did not have the sinister significance he attributes to it.

"We may add, parenthetically, that we have forborne to publish copies of several like petitions that have been sent to us, some of them for the reason that, to our notion, they were not worded as respectfully as they ought to have been, and some of them for the reason that such petitions had become too common to have much news value. These facts sufficiently answer the complaint of Mr. Looney that our criticisms of him have been actuated by ill will, and they also abundantly refute the charge that we have sought to exaggerate the unpopularity of his suit.

"Mr. Looney's large complaint is that the News misrepresented him in stating that the suit he has brought against the Katy amounts to a repudiation of the acts of the state and a breach of agreements entered into by predecessors of his in the office he occupies. He says the idea that the 'identical questions' involved in the suit he has instituted 'have heretofore been settled either by the Legislature or by compromise agreements with Attorneys General, and that it is now altogether unjust for the state to reopen the questions.' Mr. Looney says there is not a word of truth in that contention.

"That Mr. Looney's suit is absolutely destitute of new matter we did not state, nor did we say anything which would allow that inference to be made. We do not, for instance, recall that the state has ever before haled the Dallas, Cleburne & Southwestern into court to answer to the charge of not having maintained its general offices at Cleburne. For this crime Mr. Looney demands the payment of a fine amounting to something more than one and a half million dollars, which, since this magnificent highway of commerce is only about nine miles long, is probably ten times what the property is worth. There are in Mr. Looney's suit other original allegations of equal magnitude, and we at least are not disposed to begrudge him any fame he may acquire from the discovery of them.

"The idea we did mean to convey, which idea we adhere to with confidence, is that the basic complaint in this suit, and the one that must be proved sound if the chief object of his suit is to be accomplished, is an old one. This complaint is that the relation which subsists as between the Katy of Texas and the Katy of Kansas is an unlawful one. If a layman may be permitted to express an opinion, we think it is not an unlawful relation. But if it is an unlawful relation, it is a relation which the economic conditions of the present time make imperative, and if it is a sin, it is such a sin as 90 per cent. of Texas railroads are guilty of. Commerce is not confined within state boundaries, and the need of the carriers of commerce to conform to that fact cannot be destroyed nor modified by the fiat of a statute. But whether the relation which subsists as between the Katy of Texas and the Katy of Kansas is a lawful or an unlawful relation, or whether it is a nec-

essary or an unnecessary relation, it is nevertheless a relation which the state has countenanced and sanctioned. More than that may be said: The state has not only countenanced and sanctioned this relation, but it has exacted a consideration for doing so, not merely once, but twice at least. The same complaint was made in the suit which Mr. Crane, Attorney General, instituted against the Katy. It was the gravamen of that suit as it is the gravamen of Mr. Looney's suit. And when that suit was dismissed, during, we believe, the incumbency of the late Mr. T. S. Smith in the Attorney General's office, one of the considerations of its dismissal was the promise of the Katy to extend its line to San Antonio. The Katy has redeemed that promise; so that now Mr. Looney has put the state in the attitude of breaching its agreement after it has derived the profits which it exacted for making that agreement. If this does not constitute a repudiation by Mr. Looney of the acts of a predecessor, if this does not constitute a default of the state's promise, we shall have to acknowledge that we do not know the meaning of those words.

"Mr. Looney will say, of course, that the relation which subsists as between the Katy of Texas and the Katy of Kansas is not the same now as that which subsisted as between them at the time the former suit was dismissed. And we shall agree with him. At that time the Katy system was operated from St. Louis. It was in St. Louis that its general manager lived and had his headquarters. At this time the Katy system is operated from Dallas. It is in Dallas that its general manager lives and has his headquarters. So that if this relation has undergone a change, it is a change which more nicely conforms the management of the Katy to the spirit of the Texas law. The state has by judicial procedure and legislative act countenanced and sanctioned a relation that was less accordant with the laws of Texas than that which Mr. Looney considers so intolerable as to justify the forfeiture of the corporation's life. We shall be content to abide the judgment of any unbiased mind as to whether, in stating that this suit amounted to a repudiation of the state's former acts, we did not state a fact.

"Another of Mr. Looney's complaints, and one for which he asserts such rights as inure in discovery or invention, is that the Katy has in fact consolidated the Texas Central, the Beaumont, and Great Northern and several other remnants of railway, and that these consolidations constitute a violation of the law. If it had brought about what Mr. Looney, in his pleadings, calls a de facto consolidation of those lines, it went before the Legislature and induced it to validate those consolidations, so that Mr. Looney is in the attitude of repudiating an act of the Legislature in a matter which lay well within its limits of discretion. For whether these consolidated lines are 'parallel and competing,' is not a question of law, but of geography, and whether the consolidation of them ought to be permitted is a question of public policy. Any one who consults the map will discover that they are just about as parallel as are two lines that meet at an angle of sixty or seventy degrees. Of actual competition there was too little to be perceptible to the naked eye,

and it requires an imagination no less lively than would be needed to invest this suit with the appearance of justice to perceive a potential competition.

"Mr. Looney says that if the News imagines it can, by criticizing him, cause him 'to weaken in the discharge of his duty,' or that it can 'poison the minds of the public and prejudice jurors against this litigation,' it has 'descended to the contemptible level of a common jury-fixer' and is doomed to failure. We credit Mr. Looney with enough legal knowledge to know that the issues involved in this suit will not be resolved by jurors, but by judges sitting on high benches, and we are less fearful than apparently he is that these judges will be influenced by popular discussion of those issues. The News has denounced the bringing of this suit because it believes it to be an unrighteous suit and because it believes that the bringing of it does immense damage to the state. And if these reasons did not suffice to justify the criticisms of the News, *it would find in the palpable animus of the suit a sufficient reason to justify much severer criticisms than it has uttered.* This suit has neither occasion nor provocation. It is entirely gratuitous. Mr. Looney was not importuned by the public to bring it; there was no popular demand that it be brought. We doubt if a single individual asked him to bring it. Certainly the Railroad Commission did not request him to bring it, and it is peculiarly the function of that body to govern the conduct of railroads. It was manifestly the intent of the people in creating the Railroad Commission that that body should see to it that the railroads obey the laws. They meant that the Railroad Commission should be the authority to determine whether a railroad was evading or violating the laws sufficiently to warrant judicial proceedings against it, and hence, in bringing this suit on his own initiative, unbidden by the Railroad Commission, and perhaps without even advising it of his purpose, Mr. Looney himself has violated, if not the letter, at least the manifest spirit of the law.

"*One will not have to search 'far for the motives which have betrayed Mr. Looney into a course that is so radically at variance with his duty.* When Gov. Colquitt received the bill permitting the consolidations that Mr. Looney complains of he asked Mr. Looney for an opinion as to the constitutionality of the measure. Mr. Looney pronounced it unconstitutional. The Legislature, notwithstanding, repassed the bill, after it had been vetoed, by an overwhelming majority of its members. There were a good many to say, in a spirit of jest, that in repassing the bill the Legislature had not manifested much confidence in the Attorney General's legal opinion. The gibe went home. *Mr. Looney was palpably piqued.* He was immediately seized of the petty desire to vindicate his opinion by appealing his contention from the Legislature to the courts. *If Mr. Looney's sense of dignity had not been made to suffer in this way we should never have heard of this suit. In fine, it was not a sense of public duty, but one of wounded vanity, that moved him to institute this suit, and if there were no other reason, the puerile quality of the spirit which actuated him would abundantly justify a denunciation of a proceeding that is condemned by its injustice and its folly.*"

**VI. Editorial published December 1, 1913:**

"Costly Effort to Wreck the Katy Railroad.

"There are some who, while not in sympathy with the *effort* which the Attorney General is making *to wreck the Katy Railroad,* have protested that the News has exaggerated the consequence which the state must suffer *because of that wanton enterprise.* The fact is that, instead of exaggerating the injury done to the state, the News has not even approximated that injury in anything it has said.

"The immediate consequence of this suit was to suspend plans the Katy had made to extend the Texas Central to the northwest and to the southeast, and thus to create a new trunk line diagonally across the state. This suit has had the further effect of suspending plans which the Katy had made for the improvement of existing lines. It had intended to reduce grades, put in heavier bridges, build some double track and enlarge certain terminal facilities, all for the purpose of enabling itself to serve its patrons more efficiently. The Attorney General himself has admitted that plans for these extensions and improvements had been formulated. He admitted it by arguing, in his letter to the editor of the Abilene Reporter, that the suspension of those plans was not the consequence of his attempt to wreck the Katy, but the consequence of an untoward turn in the money market. The fact is, if the News has not been misinformed, that the Katy had arranged for the necessary capital in a way which was not contingent on any turn of the money market. But whether that is true or not, no man of common sense imagines that in any money market, however plethoric, the Katy could have got the millions it had planned to spend after the Attorney General had instituted a suit designed to take the corporation's life. The most reckless investors will not be persuaded to lend money to a corporation that stands in such peril.

"This indubitable consequence of this *senseless* suit is a grievous injury to the state. But great as it is, it is only one item in a bill of damages which the state will have to pay. It is not only the Katy's credit that has been impaired. The credit of practically every Texas railroad is likewise impaired, both because of the general prejudice which such assaults inevitably excite against all corporate enterprises subject to Texas laws, and because of the fact that every railroad system in Texas is exposed to the same misfortune that the Attorney General has brought on the Katy. If the Katy sins in suffering itself to be owned by an alien corporation, there are several other railroads in Texas that are guilty of identically the same sin; and if duty required the Attorney General to bring this proceeding against the Katy, duty could not excuse him for failing to bring similar suits against these other railroads. Indeed, there are considerations which suggest that he is under a heavier obligation to attempt 'the wreckage of these other railroads than he was under to attempt to wreck the Katy. For, if the relation of the Katy of Texas to the Katy of Kansas is an illicit one, it long ago bought the state's condonation of that relation by building several hundred miles of line in consideration of the dismissal of the same complaint that the Attorney General now makes against it. Few if any of these other roads have done that. They have paid no fee, as the Katy has, for a li-

cense to do what the Attorney General denounces as a sin against our laws, and an Attorney General animated by that austere sense of duty which is incapable of making invidious distinctions *cannot content himself with wrecking merely the Katy. His indignation must vent itself no less destructively against these other corporations.*

"Whether the Attorney General's ambition has this wider and longer scope, the News does not pretend to know. It has heard not even an intimation *whether the débris he hopes to make out of the Katy* will make such a monument to his political virtue as his ambition craves. But the fact that these other railroads are no less culpable than the Katy, *and that they are no less exposed to the fury of our Attorney General,* can have no other effect than to frustrate any plans which they, too, may have conceived for the extension and betterment of their lines. Every corporate enterprise, whether railroad or other, which requires alien capital for its promotion must suffer from the blight of this *insensate suit* against the Katy, and any one who would compute the damage which has been done to Texas by this proceeding against the Katy must add to the disruption of the Katy's projects the prejudice which has been engendered against not only every other railroad in Texas but every corporation that has grown large enough to excite the Attorney General's suspicions.

"It would be impossible to compute with any exactitude, in terms of dollars, what the damage is that has been done to Texas by its Attorney General; but we should say that if it were not for the lives that it has destroyed, Texas could better afford another such flood as it has suffered than another such suit as this against the Katy."

(Note. In each of the articles as set out above the language claimed to be libelous is italicized, and so distinguished from other language therein.)

The answer of appellant consisted of more than 500 pages of typewritten matter, exceptions to practically all of which were sustained by the court. If it were practical to give here even a brief résumé of the allegations in the answer, it would serve no useful purpose to do so, in the view taken by this court of the appeal.

It was not pretended in the evidence admitted at the trial that appellant, in publishing the articles complained of, was actuated by malice. In fact, the evidence consisted, except as to matters about which there was no controversy so far as the articles set out above were concerned, of those articles only.

The trial court was of opinion each of said articles was libelous per se. His rulings on exceptions interposed by appellee to appellant's answer, and on objections made by appellee to testimony offered by appellant, were in accordance with that opinion. And, appellant having failed to plead and prove the truth of the imputations the court thought the articles respectively carried, he submitted to the jury as to each of them only a question as to the amount of damages appellee had sustained by its publication. The

jury having found as the damages suffered by appellee sums aggregating the sum of $12,250, judgment was rendered in appellee's favor against appellant for that amount.

Terry, Cavin & Mills, of Galveston, Dinsmore, McMahan & Dinsmore, of Greenville, and W. L. Crawford and Muse & Muse, all of Dallas, for appellant.

Clark & Leddy, Yates, Sherrill & Starnes, and Crosby, Hamilton & Harrell, all of Greenville, for appellee.

WILLSON, C. J. (after stating the facts as above). The first, second, and third sections of Acts 1901, entitled "An act to define civil libel; to declare certain newspaper reports to be privileged communications; to allow certain matters to be pleaded and proved in mitigation of exemplary damages in civil cases, and to declare an emergency" (Gen. Laws 1901, p. 30; articles 5595, 5596, and 5597, Vernon's Statutes), are as follows:

"Section 1. A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings, tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury.

"Sec. 2. In any action for libel, the defendant may give in evidence, if specially pleaded, in mitigation of exemplary or punitive damages, the circumstances and intentions under which the libelous publication was made, and any public apology, correction or retraction made and published by him of the libel complained of. The truth of the statement or statements in such publication shall be a defense to such action.

"Sec. 3. The publication of the following matters by any newspaper or periodical, as defined in section 1, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice.

"1. A fair, true and impartial account of the proceedings in a court of justice, unless the court prohibits the publication of the same, when in the judgment of the court the ends of justice demand that the same should not be published, and the court so orders; or any other official proceedings authorized by law in the administration of the law.

"2. A fair, true and impartial account of all executive and legislative proceedings that are made a matter of record, including reports of legislative committees, and of any debate in the Legislature and in its committees.

"3. A fair, true and impartial account of public meetings, organized and conducted for public purposes only.

"4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

In Guisti v. Galveston Tribune, 105 Tex. 497, 150 S. W. 877, 152 S. W. 167, the Supreme Court, approving as correct the conclusion reached by the Court of Civil Appeals in Walker v. San Antonio Light Publishing Co., 30 Tex. Civ. App. 165, 70 S. W. 555, declared that—

"The manifest purpose of the Legislature in enacting this law was to cover the entire subject of libel as applied to civil actions, without regard to the rules of the common law and holdings of the courts on the subject."

If such was the purpose of the Legislature, it is obvious that, to accomplish it, the questions made by the record must be answered with reference alone to the meaning of the statute.

Those questions, appellant thinks, are: (1) Were the several articles libelous per se? (2) Was it entitled to prove the meaning as it claimed same to be of the language used in the respective articles, and the truth thereof with that meaning? (3) Did the burden of proving actual malice on its part rest upon appellee? (4) Was it necessary for appellee to allege and prove special damages?

The questions which appellee thinks should control in the disposition of the appeal are: (1) Were the articles libelous per se? (2) If they were, was the recovery had by him authorized in the absence, as was the case, of allegations showing he suffered special damages? (3) Did appellant in its answer allege facts justifying the publication of the respective articles?

While, because of the view taken of the record presented, the answer to the first question suggested by the parties will be the basis for the disposition to be made of the appeal, the others will be briefly noticed.

[1] In the Guisti Case, cited above, the Supreme Court held that by the terms of the statute "a libelous publication, contrary to the common-law rule, becomes actionable without the proof of malice, whether it is or not libelous per se," and, further, that "it is not necessary to the right to maintain an action for a publication not libelous per se to allege or prove special damages." So, without reference to whether the articles in question should be construed as libelous per se or not, the question numbered 4 suggested by appellant and the one numbered 2 suggested by appellee should be answered in the negative.

In King v. Sassaman (Tex. Civ. App.) 54 S. W. 304, it was held that whether a publication was libelous or not was not to be determined with reference to what the defendant intended by the language he used, "but what the words meant to the ordinary hearer." And in Belo v. Smith, 91 Tex. 221, 42 S. W. 851, the court said:

"The question is: What effect would the publication have upon the mind of the ordinary reader? What construction would he have put

upon it? For in defamatory language it is not so much the idea which the speaker or writer intends to convey as what he does in fact convey. It is the effect upon the character of the person alleged to be defamed by the utterance which the law considers, and therefore the utterer uses the language at his peril."

[2] If the language of the publication is unambiguous, as it is in the articles in question, it is the duty of the court to construe its meaning and determine whether it is libelous or not, and that without reference to the meaning attributed to it by either the plaintiff or the defendant. Therefore we think the question numbered 2 suggested by appellant also should be answered in the negative. And it may be added that, for the same reason, a like answer should be made to the third of the questions stated by appellee, if he means by it to suggest an inquiry as to whether the allegations in appellant's answer should be construed as charging that the imputations in the respective articles were true. The allegations did not go farther than to charge that imputations which the writer of the articles intended them to convey were true. They did not charge that imputations which, we think, an ordinary reader would have understood the language used to convey were true.

[3] The answer to the question "Did the burden of proving actual malice on the part of appellant rest upon appellee?" will depend on the answer made to the principal question, to wit, Were the articles, respectively, libelous per se? If the latter should be answered in the affirmative, the former should be answered in the negative; otherwise it should be answered in the affirmative.

Each of the articles, it is thought, contains imputations "tending to injure" appellee's reputation and expose him to either "public hatred, contempt or ridicule," or to impeach his "honesty, integrity or virtue." Therefore, if its character must be determined with reference alone to the definition in section 1 of the statute, each of the articles should be held to be libelous on its face.

But, as is shown in the statement above, each of the articles was published by appellant in its newspapers, and was about official acts of appellee as Attorney General. Therefore a question arises as to whether their respective characters can be determined with reference to that definition alone, and without reference to the declaration in section 3 (article 5597), that—

"The publication of the following matters by any newspaper, * * * as defined in section 1, shall be deemed privileged, and shall not be made the basis of an action for libel without proof of actual malice. * * *

"4. A reasonable and fair comment or criticism of the official acts of public officials."

246 S.W.—49

Should the language quoted from section 3 be treated as a qualification of the definition in section 1? In other words, is a publication by a newspaper, without actual malice, of comment or criticism of the official acts of a public official which tends to injure the official's reputation and to expose him to public hatred, etc., or to impeach his honesty, etc., libel, if the comment or criticism is reasonable and fair?

It will be noted that the declaration in section 3 in effect is that the publication by a newspaper, without actual malice, of matter as defined in section 1 (that is, matter which if published by other than a newspaper would be libelous), is not actionable if the matter published is "a reasonable and fair comment or criticism of the official acts of public officials." Now, if such a publication is not actionable, it is not libelous; for in legal contemplation nothing is libelous that is not actionable. Hence it would seem that in such a case the definition in section 1 should be treated as qualified by the language in section 3, and that it would follow that before it should be said that comment or criticism of official acts of a public official published by a newspaper without actual malice is libelous, the comment and criticism must appear, when considered with reference to the official acts commented upon, to be unreasonable and unfair.

If the statute should be so construed, then in every case where the plaintiff's cause of action is predicated upon comment or criticism of his official acts as a public official published by a newspaper, the burden is on him to allege and prove either (1) that the comment or criticism, when considered with reference to the official acts commented on, was unreasonable and unfair, or (2) that the publication was made with actual malice. The correctness of the statement will not be questioned so far as it is to the effect that the burden is on the plaintiff to show actual malice, if the comment is reasonable and fair. It is believed its correctness, so far as it is to the effect that the burden is on him to show the nature of the comment or criticism is as little subject to question; for, as we have seen, reasonable and fair comment or criticism of official acts of public officials published by a newspaper without malice is not libel. The plaintiff in such an action must bring his case within the definition of an actionable libel. He can do that, in the absence of proof of actual malice on the part of the defendant, only by showing that the comment or criticism of which he complains was unreasonable and unfair.

An examination of the articles in question, as set out in the statement above, will disclose that the language in each of them claimed to be defamatory referred exclusively to official acts of appellee as Attorney General. That appellee did not assert to

the contrary is shown by his testimony as a witness in his own behalf. He testified:

"I cannot put my finger now on any criticism of B. F. Looney as a man, aside from B. F. Looney as Attorney General, in the Dallas News from its foundation, nor can I put my finger on any criticism of B. F. Looney as a man, aside from B. F. Looney as Attorney General, in the Galveston News from its foundation fifty years ago, down to date."

[4] Was the language complained of "comment or criticism?" In Galveston Tribune v. Johnson, 141 S. W. 302, the Court of Civil Appeals said:

" 'Comment or criticism' * * * does not involve a statement of a fact at all, but only the opinion of the writer."

If the court meant, as it is suggested it did, that "comment and criticism" ceases where language ascribing to the public officer an unworthy motive begins, then we think it gave to the words a more restricted meaning than the use made of them in the statute justified, or than is justified by the meaning ascribed to them by lexicographers. If effect is given to the language used by the Legislature in section 3, then, as has been shown, the plain meaning of the statute is that the publication by a newspaper, without actual malice, of comment or criticism of official acts of a public official which tends to expose him to public hatred, etc., or impeach his honesty, etc., is not actionable, and therefore not libelous, if such comment or criticism is reasonable and fair. If such is the meaning of the statute, then, plainly, comment on, or criticism of, a public official's official act may go so far as to impute to him an unworthy motive in the performance of the act, and yet not be libelous. For instance, it is not possible to impeach the honesty of a public official, as the statute says comment on his official act published by a newspaper may, without imputing in such comment an unworthy motive to him in connection with the act; for it is not possible to impeach an act as dishonest without imputing a wrong motive to the actor.

In reaching the conclusion indicated, we have not been unmindful of the fact that at common law as anciently construed the meaning of the words "comment and criticism" was restricted as the Court of Civil Appeals may have intended in the Johnson Case, supra, to restrict their meaning. But we are of opinion effect cannot be given to the plain language of section 3 of the statute, if the meaning of the words is so restricted; and the Supreme Court, in the Guisti Case, cited above, as we have seen, declared that the statute is to be construed "without regard to the * * * common law and holdings of the courts on the subject."

[5] Having determined that the matter complained of in the articles was comment and criticism of appellee's official acts as Attorney General, it remains for us, in answering the question: Were the articles, respectively, libelous per se? to determine whether it appeared from the faces of the several publications that the comment therein was unreasonable and unfair.

The official acts commented on were the acts of appellee as Attorney General in commencing and prosecuting in Hunt county a suit against the Magnolia Petroleum Company and others, and his acts as Attorney General in commencing and prosecuting a suit against the Missouri, Kansas & Texas Railway Company of Texas and other railway companies.

As we construe the language used, personal, as distinguished from official, misconduct was not imputed to appellee in either of the articles. The imputations, briefly stating them, in regard to the suit against the oil companies were that the suit and proceedings therein were unjust and reprehensible; that it was commenced and prosecuted at the instance and for the benefit of other and competing oil companies and to further political ambition appellee entertained, and that it was filed in Hunt county, where appellee residcd, as "a place where injustice may be worked out." The imputations in the articles in regard to the suit against the railway companies were that the suit was an effort on the part of appellee to wreck the Missouri, Kansas & Texas Railway Company of Texas, that it was unjust, and that in instituting and prosecuting it appellee was actuated by prejudice, spite, and pique and political ambition he harbored.

Now, however unreasonable and unfair the imputations may have been in point of fact, it cannot be said they were so in point of law, unless it can first be said that it appeared from the faces of the respective articles that the imputations were not reasonable and fair. Did it so appear? If it did not, the judgment is erroneous, for it was predicated on the theory that the several publications were libelous per se, and all evidence offered in support of the theory that they were not, contended for by appellant, was rejected.

The nature of comment on an official act in every case must be determined with reference to the act. Therefore, unless in a given case the publication complained of itself, admittedly, contains full information in regard to the act, the comment should not be said, as a matter of law, to be unreasonable and unfair. Here the acts of appellee, as Attorney General, commented on were his acts in connection with the suit against the oil companies and the suit against the railway companies. Those acts did not, we think, consist alone of the filing of the suits, but included the contents of pleadings and other papers, if any, filed by him in the suit. What the pleadings were, what the contents of other papers, if any, filed by appellee as

Attorney General were, was not fully revealed by the publications in question.

The only information about the suit and the proceedings therein against the oil companies disclosed by the articles complained of, was that it was filed in Hunt county, where appellee resided; that it was for violations of the anti-trust law of Texas and to oust the Magnolia Petroleum Company from the state; that without notice to it, appellee had his banker appointed receiver of said oil company and its property turned over to him as receiver; that the petition filed by appellee did not charge that the oil business was monopolized by the defendants, but charged that they had so parceled out the state among themselves that one of them could not sell in territory occupied by another; and further charged that said Magnolia Petroleum Company was owned by the Standard Oil Company. The only information the articles furnished about the suit against the railway companies was that the petition charged that they had consolidated their lines in violation of law, and that one of them, the Missouri, Kansas & Texas, was owned by the Missouri, Kansas & Texas of Kansas.

Now, the criticism complained of was not confined to the acts specifically mentioned in the articles, but, as we have seen, extended to all of appellee's acts in the prosecution of the suits. The effect of holding that the publications were per se libelous was to exclude from consideration in determining whether the criticism was reasonable and fair or not acts covered by same but not specifically mentioned. Such a rule, it is believed, should not be applied in cases like this one; for, while it might not operate unjustly in some of them, in others it might. In a given case of the class, with full information as to the acts covered by the criticisms complained of, it might clearly appear that the criticism was reasonable and fair, while with only the incomplete information contained in the publication complained of the criticism might as clearly appear to be unreasonable and unfair.

It may be, had appellee's pleadings authorized it, and had he introduced in evidence the portions of the record in the two suits referred to which showed his acts as an Attorney General in connection therewith, that it would have so conclusively appeared that the comment and criticism complained of was unreasonable and unfair that the court properly might have instructed the jury that the articles, or some of them, were libelous, not per se, but when considered with reference to the other evidence. Such a question, as we have seen, is not presented by the record before us. The question so presented is, Were the articles, respectively, libelous per se? We answer, they were not.

The conclusion reached will require a reversal of the judgment. And, it may be stated, if the statute should be construed as operating to place on appellant the burden of alleging and proving the comment to be reasonable and fair, we still would be of opinion the judgment should be reversed, because of the action of the court in sustaining exceptions to (1) the parts of appellant's answer alleging that the matter complained of in the articles was such comment and criticism; (2) the parts of said answer alleging that the article numbered 2 in the statement was a fair, true, and impartial account of a public meeting of the Corsicana Commercial Club, organized and conducted for public purposes only; and (3) in excluding evidence to support such allegations, including the pleadings and other papers filed by appellee as Attorney General in the two suits.

The assignments in appellant's brief not in effect disposed of by what has been said are overruled.

In a cross-assignment appellee complains of the action of the court in refusing to set aside the verdict of the jury denying him a recovery on account of another article published by appellant, referred to as the "Missouri article," which he claimed was libelous of him. We have reached the conclusion that the action of the court was not erroneous, and therefore overrule the assignment.

The judgment is reversed, and the cause is remanded, for a new trial.

HODGES, J. (dissenting). While I concur in much that is said in the opinion written by Chief Justice WILLSON, I do not agree to the disposition made of the case nor to the grounds upon which the judgment of the trial court is reversed. It appears from the pleadings of both parties that there are two official acts of the Attorney General which formed the subject-matter of the publications complained of in this action. One of these is the filing of a suit on March 4, 1913, in Travis County, by the Attorney General, in the name of the State, against the Missouri, Kansas & Texas Railway Company and some other railway companies named, seeking to enjoin their consolidation under the provisions of an act of the Thirty-Third Legislature (chapter 11). This suit was based upon the contention by the Attorney General that the act authorizing the consolidation was in conflict with the constitutional provision prohibiting the consolidation of parallel or competing lines of railroads. The other is a suit instituted by the Attorney General, in the name of the state, in the district court of Hunt county, against the Magnolia Petroleum Company, some other corporations and individuals, seeking to recover penalties for the violation of the anti-trust law and to forfeit the charters of the offending corporations.

I shall not undertake to set out in full all of the different publications, inasmuch as that has been done by the CHIEF JUSTICE in his opinion. It was charged by the ap-

pellee in his original petition that each of these different publications was without probable cause, was published and circulated recklessly, wantonly, and maliciously, and with the intent to injure the appellee as a citizen, lawyer, and public official, and that he was so injured. It was also alleged that his peace of mind and feelings were disturbed, and that he was harassed and vexed and suffered much humiliation and shame on account of those publications. The articles were set out at length in the appellee's petition, and their publication was admitted by the appellant. No issue was made as to the occurrence of the official acts referred to in those articles. The appellant, however, denied that it was actuated by malice or any intent to injure the appellee; denied that it intended to charge the appellee with any improper motive in filing the suits referred to; and further denied that the publications complained of were fairly susceptible of the construction placed upon them by the appellee. It also pleaded that the matters were true in the sense they were intended to be understood; that is, that the Attorney General in bringing those suits acted unwisely, without proper advice, and in an unusual manner, and that the result of his actions was injurious to the welfare of the public generally, as well as to the corporations sued. It further alleged that the articles complained of were no more than fair and reasonable criticisms of the official acts of the Attorney General, and for that reason were, under the laws of Texas, privileged matter.

As to one of the articles reproducing what is called the "Corsicana resolution," it alleged that this was a fair, true, and impartial account of a public meeting, organized and conducted for public purposes only, and for that additional reason this publication was privileged. Upon the trial the court below took the view that each of the articles copied in the opinion of the CHIEF JUSTICE was upon its face libelous, and not privileged matter; but submitted to the jury only the issue as to the amount of general actual damages which the appellee had sustained.

While the record is large and the assignments are numerous, the determination of two questions will, it occurs to me, solve the controlling issues involved in this appeal. The first is, Were the publications libelous per se; that is, could the court from an inspection of them say, as a matter of law, that they tended to injure the name or reputation of the appellee, or to expose him to public hatred, contempt, or ridicule, or to impeach his honesty, integrity, or virtue and thereby expose him to public hatred or ridicule? If this question can be answered in the affirmative, then the second question arises: Was the court authorized to say, as a matter of law, without hearing any other evidence than those publications, that they did not come within the privileged class designated in the statute? If both of these questions can be answered in the affirmative, then the judgment should be affirmed. But if either of them should be answered in the negative, the judgment should be reversed. I shall discuss these questions in the order stated above, and shall first examine the publications with a view of determining whether or not they were libelous upon their face.

It may be stated at the outset that the language of these different articles was sufficiently plain and unambiguous to dispense with any necessity for referring them to the jury for the purpose of ascertaining their meaning. Article 5595 of the Rev. Civ. Statutes provides:

"A libel is a defamation expressed in printing or writing * * * tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity or virtue or reputation of any one * * * and thereby expose such person to public hatred, ridicule or financial injury."

I have omitted from the above quotation those provisions of the statute which have no reference to the subject-matter under discussion. As stated in the opinion of Chief Justice WILLSON, this statute relating to libelous publications is more comprehensive in some respects than the common law upon that subject; hence it becomes practically our sole guide in determining the issues involved. There is among the members of this court no difference of opinion concerning the injurious character of the publications complained of, upon which the judgment of the court below is based. It is agreed that each of the six articles submitted as a basis of recovery did tend to produce one or more of the injurious consequences mentioned in the provision of the statute quoted, and that the trial court was authorized to so conclude as a matter of law. That the writer or writers of those articles intended by their publication to arouse public disapprobation of the course pursued by the Attorney General is too plain for argument. That the language used tended to arouse public censure and to produce an injury to his name and reputation as an officer and a man is equally plain. There was therefore no occasion for submitting that issue to the jury.

We come, then, to the second inquiry: Was the court authorized, as a matter of law, to hold that the publications were not privileged under the statute? If article 5595 stood alone there would be no difficulty in sustaining the action of the trial court in submitting to the jury only the question of the amount of damages recoverable. But our libel law contains two other articles. Under the provisions of article 5596 the truth of the statement or statements in injurious

publications is made a defense. Article 5597 is as follows:

"The publication of the following matters by any newspaper or periodical, as defined in article 5595, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice:

"1. A fair, true and impartial account of the proceedings in a court of justice, unless the court prohibits the publication of the same, when in the judgment of the court the ends of justice demand that the same should not be published, and the court so orders; or any other official proceedings authorized by law in the administration of the law.

"2. A fair, true and impartial account of all executive and legislative proceedings that are made a matter of record, including reports of legislative committees, and of any debate in the Legislature and in its committees.

"3. A fair, true and impartial account of public meetings, organized and conducted for public purposes only.

"4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

In determining whether or not the plaintiff has made out a case, we must look to all of these statutory provisions. If in proving an injurious publication he offers in evidence one which upon its face appears to be privileged, he of course fails to establish a cause of action. If, for instance, he should rely for a recovery upon proof of a publication which clearly appeared to be only a criticism of the official acts of a public official, and it should further appear from the facts alleged or admitted by the plaintiff to be true that such criticism was fair and reasonable, there would be no ground for recovery. But suppose the plaintiff should rely upon a publication which appears upon its face to be no other than a comment or criticism of an official act of a public officer, does the burden rest upon him to allege and prove that it was inspired by malice or that it is unfair, or unreasonable comment or criticism? Without expressing an opinion upon that question, I shall concede, for the purpose of this inquiry, that the burden in such an instance would rest upon the plaintiff to both allege and prove malice or that the offensive publication was unfair or unreasonable. I understand from the record before us that the court gave the instruction he did, not because the defendant had failed to prove privileged publications, but because the undisputed evidence and the admitted facts conclusively showed that those publications were not within the privileged class. Any question of the burden of proof, therefore, becomes wholly immaterial. The appellee's prefatory averments concerning his official position, the filing of the two suits before referred to, their character and purpose, were not contested by the appellant. The offensive articles were set out at length, and their publication admitted.

The defense was that all of them were comments on, and criticisms of, the official acts of the Attorney General as a public officer, that they were fair and reasonable, and that one of them was a fair, true, and impartial account of the proceedings of a public meeting. If by an inspection of these publications the court was authorized to say, as a matter of law, that they tended to produce any one or more of the injurious consequences mentioned in article 5595 previously quoted, and that they were not exclusively comments or criticisms of the official acts of a public officer, and that one of them, which purported to be the report of the proceedings of a public meeting, was not a fair, true, and impartial account of a public meeting, organized and conducted for public purposes only, it follows that the plaintiff had not only established a prima facie case, but had made one which called for the peremptory instructions that were given.

Having ascertained that the publications were upon their face injurious within the meaning of article 5595 of our statute, the trial court was confronted with this question: Were they fair and reasonable comments on, or criticism of, the official acts of the Attorney General? The privilege allowed by subdivision 4 of article 5597 is limited to language which properly falls within the usual and accepted meaning of the terms "comment" and "criticism." In the absence of this subdivision, any character of comment or criticism, whether with or without malice, and regardless of whether or not it is fair or reasonable, when directed against the official act of an officer, is made actionable if it tends to injure his reputation. The effect of this provision, following article 5595 as it does, was to carve out of the mass of injurious publications those which are enumerated as privileged. In view of the unambiguous language used, it then became the duty of the court to say whether or not the publications fell within the statutory privileged class.

To come within this particular privilege two conditions are required: First, the offensive matter must be comment or criticism; second, it must relate to the official acts of the public officer. The terms "comment" and "criticism" are thus defined in the Century Dictionary:

"Comment (the verb). To make remarks or observations, as on an action, an event, a proceeding or an opinion; especially to write critical or expository notes on the works of an author; to make remarks or notes upon, expound, discuss, annotate.

"Criticism. The act of judging of and defining the qualities or merits of a thing, especially of a literary or artistic work; the act of criticizing; discrimination or discussion of merit, character or quality; the exercise or applica-

tion of critical judgment; in a restricted sense, inquiry into the origin, history, authenticity, character, etc., of literary documents; a critical judgment, especially a detailed critical examination or disquisition."

The words "comment" and "criticism" generally signify a discussion of assumed or conceded facts. The judgments and conclusions pronounced are supposed to follow as logical deductions from those assumed facts or conditions. While the critic, or commentator, must necessarily state the facts which are to form the subject-matter of his animadversions, he is, nevertheless, responsible for their truthfulness. If in stating his facts he includes those which are not true, he cannot escape liability for their injurious consequences by following the statement with a comment or criticism. The statute evidently did not intend to permit the publication of a false accusation under the guise of comment or criticism. In Galveston v. Johnson (Tex. Civ. App.) 141 S. W. 302, this provision of the statute was discussed, and the court used the following language:

"It will be noticed from a reading of the entire act that other statements, in order to entitle them to the character of privileged statements, are required to be 'fair, true and impartial.' These other publications involve statements of facts that have occurred, and, when such statements of facts are made, and they come under the definition of libel in section 1 of the act referred to, they must be true to be privileged. This standard of truth, however, cannot be practically applied to a 'comment or criticism,' which does not involve a statement of a fact at all, but only the opinion of the writer, and hence is only required to be fair and reasonable to be privileged."

I understand the Supreme Court has approved that case by refusing a writ of error.

For the purpose of testing the character of the publications complained of by the definitions above stated, I quote in full one of the editorials:

"A careful reading of the petition filed by Attorney General Looney in his suit against several oil companies has failed to disclose any allegation that the oil business is monopolized either by these defendant companies or any other companies. Their chief offense seems to be that they have a blood relation to one another, or a financial relation, with the Standard Oil Company as the grandfather of them all. Also they seem to be accused of having somehow parceled out the state among themselves; that is, to agree that one will not sell in a field occupied by another member of the family. If there is no monopoly of the oil business in this state, if, on the contrary, there is competition, whether among the members of this alleged Rockefellerian oil family, or among its members on the one side and oil companies of other breeding on the other—if, in short, there is competition and not monopoly in the oil-selling business of Texas, we can see no occasion whatever for the Texas anti-trust law to become excited, much less indignant."

What the author has written thus far may pass for criticism of an official act; or if not, it may be treated as harmless upon its face. But he continues:

"Maybe, if one could go deep enough, one would see that the grievance is, not that there is no competition, but that there is too much, wherefore the desirability of having the anti-trust law drive some oil companies out of the state that the others may not be forced to lead so strenuous a life. There are nine ways to skin a cat and at least two uses to be made of an anti-trust law."

This last paragraph evidently meant to convey the idea that if the Attorney General's purpose in instituting that suit could be revealed it would probably disclose a design to prevent competition among oil companies; thus charging that he was making an improper use of the anti-trust laws. Here the motive of the officer is distinctly referred to, and an improper one is imputed. That portion of the article is the statement of a fact which may be true or untrue. If true, it was susceptible of proof by evidence, like any other fact. If untrue, it was not a fair or reasonable comment or criticism; in fact, it was not a criticism at all, but an accusation calculated to produce some of the injurious consequences which the statute makes actionable. If such an accusation, unaccompanied by criticism, had been made, the statutory defense would lie in proving its truth. That duty is no less imperative when the accusation is coupled with a criticism. The statutory protection accorded to criticism and comment cannot be employed as a subterfuge to cover that which is not criticism or comment. To hold differently would permit an unwholesome and destructive use of the liberty of criticism and comment. In its pleadings the appellant does not undertake to defend this imputation of improper motive by proof of its truth, but, on the contrary, disclaims having made any such imputation. It appears to be tacitly admitted that under the facts of this case an attack upon the Attorney General's motives charging such as would tend to dishonor him as a man or reflect upon his fidelity as an officer, cannot be defended solely upon the ground that the language is criticism or comment on an official act. If that proposition be correct the court below at that juncture had before it only this issue of fact: Did the publications upon their face attribute to the appellee an improper or dishonorable motive? If they did, then there is no defense pleaded, and the court pursued the only course then open to him.

But, even if we should treat this offensive language as criticism or comment, it is a criticism of the man, not of the act alone. The act was official, but the motive was personal. The practical and legal consequences of the official act were unaffected by the good

or bad motive of the officer. However difficult it may be at times to separate the act from the actor, so as to permit a criticism of the one without injuring the other, the statute has made the separation necessary for one who would claim the privilege granted.

The damaging odium which a critic or commentator may cast upon an officer is that which results logically and inferentially from an exposition of the official conduct assailed. I shall refer to only a few of the many authorities which sustain this proposition. Mr. Newell in his work on Slander, p. 567, says:

"Criticism differs from defamation in the following particulars: (2) It never' attacks the individual, but only his work. Such work may be either the policy of the government, the action of a member of a legislative body, a public entertainment, a book published, or a picture exhibited. In every case the attack is on a man's acts, or on something, and not upon the man himself. A true critic never indulges in personalities, but confines himself to the merits of the subject-matter. (3) It never imputes or insinuates dishonorable motives unless justice absolutely requires it, and then only on the clearest proofs. (4) The critic never takes advantage of the occasion to gratify private malice or to attain any other object beyond the fair discussion of matters of public interest and the judicious guidance of the public taste. He carefully examines the matter, and then honestly and fearlessly states his true opinion."

Again, he says:

"Criticism and comment of well-known or admitted facts are very different things from the assertion of unsubstantiated facts. A fair and bona fide comment on a matter of public interest is an excuse for what would otherwise be a defamatory publication. The statement of this rule assumes the matters of fact commented upon to be somehow ascertained. It does not mean that a man may invent facts and comment on the facts so invented, in what would be a fair and bona fide manner, on the supposition that the facts were true. If the facts, as a comment upon which the publication is sought to be excused, do not exist, the foundation fails. There is no doubt that the public acts of a public man may lawfully be made the subject of fair comment or criticism, not only by the press, but by all members of the 'public. But the distinction cannot be too clearly borne in mind between comment or criticism and allegations of fact, such as that disgraceful acts have been committed or discreditable language used. It is one thing to comment upon or criticize, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty. of particular acts of misconduct. To state matters which are libelous is not comment or criticism."

The same author, quoting from Neeb v. Hope, 111 Pa. 145, 2 Atl. 568, says:

"In criticizing the conduct of a public officer, the publishers of a newspaper render themselves liable for an action for false and groundless imputations of wicked motives or of crime."

In Wofford v. Meeks, 129 Ala. 349, 30 South. 625, 55 L. R. A. 214, 87 Am. St. Rep. 66, the court used the following language in discussing the privilege of the press in criticizing an official act:

"If an editor goes out of his way to asperse the character of a public man or set of men, and to ascribe to him or them base or corrupt motives, he does so at his peril, and must prove the truth of his charges, or answer in damages to the party or parties charged."

In Levert v. Daily States Publishing Co., 123 La. 594, 49 South. 206, 23 L. R. A. (N. S.) 726, 131 Am. St. Rep. 356, the court said:

"The privilege of fair and reasonable criticism of public men does not embrace the right to publish a false statement of fact, or to falsely impute to them malfeasance or misconduct in office."

In McAllister v. Detroit Free Press Co., 76 Mich. 338, 43 N. W. 431, 15 Am. St. Rep. 349, this language is used:

"The acts of officers may be criticized. They may even be exposed to ridicule and sarcasm without subjecting the publisher to liability for libel. It is otherwise with respect to the private characters and motives of officers. Aspersions upon them are at the peril of the publisher. He may escape this peril by showing that they were true."

In Curtis v. Mussey, 6 Gray, 373, the court said:

"There were passages in the publication, which appeared on their face to be libelous, such as the charge * * * of prejudice and want of feeling. The assertion that the decision of the commissioner was a partisan and ignoble act; the statements complained of were not privileged communications, and, as discussions upon a matter of public interest, did not appear to be justified, because they charged the plaintiff with corrupt and improper motives, and because the answer did not aver their truth."

If at common law the gratuitous imputation of a dishonorable motive to a public officer was not legitimate criticism of or comment on his official acts, I am unable to see why it should not now be equally unlawful. There is nothing in the statute itself, or the conditions under which it was adopted, to indicate that the Legislature intended to give the words "comment" and "criticism" a more extended signification, or that it intended to make the privilege more comprehensive than it was at common law.

It follows from what has been said that the court below correctly held that the article discussed was not a privileged publication. What is said of that editorial may with equal propriety be said of all the other publications except the Corsicana resolution. It is apparent that each of the former, to a greater or less extent, attacked the motive and design of the Attorney General in instituting the suits referred to.

As to the Corsicana resolution, it cannot fairly be said that this was not a comment or criticism. If, therefore, it is not privileged, it is because it was not reasonable and fair. The terms "reasonable" and "fair" are probably as easily understood as any in our language. If in the course of his criticism a writer announces a conclusion which the facts discussed clearly do not justify, and which tends to injure the party whose conduct is being criticized, the writing is both unfair and unreasonable. The act of the Attorney General, which this resolution assailed, is the filing of the suit against the Magnolia Petroleum Company and others in Hunt county, and having a receiver appointed without a hearing. It is conceded that such a suit for such a purpose might legally have been filed in Hunt county. There is no contention that the judge who presided over the district court in that county was not as capable and as impartial as any who presided over the courts in Travis county, the place where such suits are usually filed. Neither is there any contention that in Hunt county there existed any prejudice or ill feeling against any of the defendants in that suit, so that they could not get a fair trial in that county. Conceding, then, that a receiver was appointed to take charge of the property of the defendants without any previous notice having been given, and that a personal friend of the Attorney General was selected for the place; this does not imply that an injustice had been done by the Attorney General. The appointment of a receiver is a matter placed by law in the hands of the presiding judge; and whether the appointment shall be made without notice is a matter that rests within his discretion. There was no attempt to show that the selection of the appointee was at the instance of the Attorney General, or that the appointee was an unfit person; in short, there was no offer to prove that the defendants in that suit were, by reason of its being filed in Hunt county, deprived of any advantage or defense they might have utilized had the suit been filed in Travis county. The fact that this was an unusual place to bring such suits, or possibly that the Attorney General once resided in Hunt county, are the only circumstances tending to show that an effort was being made to deal unfairly with the defendants in selecting the venue of that suit. Yet with only these circumstances and conditions, the meeting held at Corsicana adopted a resolution which, according to the headlines used in its publications, condemned the Attorney General. In the body of the resolution, referring to his conduct, it says, among other things:

"It has (referring to the institution of that suit) the appearance of lynch law, or of a mock trial where the only effort is to procure a place where injustice may be worked out. It is not usual for an officer who is seeking to enforce the law to select an unusual and arbitrary place as a background for his act."

In another place this language is used:

"We can see no reason why the companies or their stockholders and officers should be subjected to such unjust, unusual, and arbitrary treatment that puts them to great cost, deprives them of the control of their property, and humiliates them before their fellow citizens by a prejudgment."

And again:

"We are unalterably opposed to such unjust and reprehensible legal proceedings," etc.

It is evident that the offensive language used in this resolution was dictated largely by a spirit of resentment aroused to the point of indignation. It is violent and intemperate, and not such reasonable or fair comment or criticism as the statute contemplates shall be privileged.

It is further contended that this article is privileged because it is a fair, true, and impartial account of a public meeting, organized and conducted for public purposes only. It may be conceded that this resolution as published is a fair, true, and impartial account of that portion of the proceedings of the meeting from which it emanated. It may further be conceded that the meeting was public, in the sense that it was open to every member of the commercial organization and to every other person who cared to attend. But this is not all that is required to make such matter privileged. It must be shown also that the meeting was one organized and conducted for public purposes only. I understand that the statute contemplates as a public purpose that which has for its object the furtherance or promotion of the public welfare, the advancement of some public enterprise or undertaking which results in a benefit to the community at large, or which would suppress, prevent, or discourage some evil from which the public generally might suffer. To be for a public purpose the object sought must be for the benefit or the good of the community as contradistinguished from that of private individuals. The resolution bears upon its face evidence that it was an attempt on the part of a public gathering to discourage litigation in the name of the state against private corporations and some private individuals. The public had no more interest in that litigation than in any which had for its object the enforcement of the anti-trust law. The evil consequences resulting from the improper institution of that suit and the unwarranted appointment of a receiver were limited to the defendants in that suit, and not shared by the public at large. It is clear, therefore, that the object which the resolution undertook to accomplish was to remedy a private wrong. That being true, the resolution

itself furnishes conclusive evidence that the meeting, although it may have been public, did not confine its activities to those things in which the public alone was interested.

The appellant urges as a defense that, having denied the truth of the innuendos of the appellee, and having pleaded the truth of its publications in the sense it intended they should be read and understood, it was entitled to offer proof in support of its pleadings and in contradiction of the averments of the appellee. In a proper case doubtless the defendant in a libel suit should be permitted, while admitting the publication, to deny and disprove the truth of the innuendos employed by the plaintiff in stating his case; but that defense is not available when the publication is so plain that it requires no innuendos to interpret its true meaning, and where the defense rests upon attributing a meaning clearly at variance with that which appears upon the face of the publication itself. The test in determining whether or not a publication is libelous or not is the meaning which an ordinary reader would give to the language employed. Belo v. Smith, 91 Tex. 225, 42 S. W. 850. If the language is unambiguous and sufficiently full to disclose all that need be known to understand the writer's meaning, the defendant cannot rely upon proof of a different meaning.

I find no reversible error in the rulings complained of, and think the judgment of the trial court should be affirmed.

### On Appellee's Motion for Rehearing.

WILLSON, C. J. Pending action on the motion, this court, at appellee's instance, on November 2, 1916, certified to the Supreme Court the question of law covered by Judge HODGES' dissent from the conclusions reached by the majority of this court. The questions were answered by the Supreme Court in an opinion delivered December 13, 1922, filed here January 15, 1923. The Supreme Court concluded that each of the publications set out in the opinion of this court was libelous per se, and answered the questions certified to them accordingly. It follows that the judgment of this court, reversing and remanding the cause for a new trial, was erroneous. Therefore the motion is granted, said judgment will be set aside, and the judgment of the court below will be affirmed.